EDDIE LEE HAYNES, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 17246

June 25, 1987                                     739 P.2d 497

*Morgan D. Harris,* Public Defender, *Terrence M. Jackson,* Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

This is an appeal from a conviction of first degree murder and imposition of the death penalty. We reject Haynes's claims of error during the guilt phase and affirm the conviction. For reasons to be stated, we annul the death penalty and substitute the sentence of life imprisonment without the possibility of parole.

To understand why we cannot allow the death penalty to be imposed, a rather detailed account of circumstances surrounding the homicide is provided.

On June 4, 1985, Eddie Lee Haynes walked up behind Robert Ross, who was washing a car, and hit him on the head twice with an iron pipe. Ross died from the head injuries. Haynes thought Ross was a member of a group that had earlier peered over a wall at him and taunted him for masturbating behind some bushes. Three individuals saw Haynes strike Ross. Haynes was chased down a railway track into the local Teamsters' building. Haynes was trapped in that building until the police arrived and arrested him.

The arresting officer found Haynes in the bathroom where he was washing his face and hands. A scuffle occurred before the arresting officer was able to handcuff Haynes.

After being read his Miranda rights, Haynes said "yes" when asked if he understood those rights. Haynes identified himself, and when asked if he was the one who hit a man with a pipe, Haynes said "yes" and "that's just the beginning." Haynes was laughing when he made these statements. Haynes stated at the time that he was going to kill anybody who "messed" with him. He continually talked of killing and called for Lucifer to help him.

Because Haynes received a cut on his head from a rock thrown by one of his pursuers, paramedics arrived at the scene of the arrest to treat him. When asked by a paramedic if he took drugs, Haynes replied that he took anything and everything he could get his hands on. At the scene of arrest, Haynes was described by the paramedics as being very agitated and belligerent. He was unsure as to why the paramedics were there, and he thought they were there to hurt him. He refused to tell the paramedics his past medical history. He complained that "people had been messin' with him." His pupils were dilated but responsive; his speech was slightly slurred. He did not like to be touched in any way. He looked straight at one paramedic and said: "I will kill you if you mess with me."

While being transported to the hospital, Haynes talked of Hell. He mumbled incoherently. He stated that he would "kill anybody who got in his way" and that he would "hunt down and kill them." He remarked that everyone wanted to hurt him.

At the hospital, while being transported from a gurney to a bed, Haynes threatened that he would "kill any motherf----- that messed with him." Haynes was taken to a private, curtained-off room because he was screaming and boisterous. In the private, curtained-off room, the arresting officer heard Haynes holler, several times, "Oh, God, I killed somebody" and "I got so much more to do." When the officer looked inside the curtained area, Haynes was masturbating while saying those phrases. Haynes continued to masturbate, looked at the officer, and smiled.

During the entire time Haynes was in the hospital, he rambled and talked about things that made no sense. At the hospital, Haynes continually employed "satanic type phrases" and referred to Lucifer. Blood and urine samples taken from Haynes revealed that he was not under the influence of alcohol or drugs. Haynes was given Haldol, an antipsychotic medicine.

An officer testified at the preliminary hearing that while being transported from the hospital to the jail Haynes "acted erratically or said bizarre things," Haynes talked of killing someone (anyone), and Haynes said he was tired of being "messed with."

During the months prior to the homicide, Haynes had been arrested several times. On February 23, 1985, Haynes was arrested for masturbating while completely naked on the lawn of the law library in downtown Las Vegas. On February 26, 1985, Haynes was arrested for throwing rocks toward the street; one rock cracked the windshield of a car. On March 16, 1985, Haynes was arrested for disorderly conduct wherein he challenged a highway patrolman to shoot him. On April 15, 1985, Haynes was arrested for refusing to leave the steps of an apartment complex. He was found sitting on those steps mumbling about God and singing. Haynes threatened to poke out the eyes of the apartment manager's dog and threatened to hurt the persons who asked him to leave. When arrested, Haynes rocked the patrol car and threatened to "kill everybody."

On May 21, 1985, a little over two weeks before this killing, Haynes was arrested for open and gross lewdness when he was observed masturbating on a sidewalk near heavy vehicle traffic. At that time, Haynes was examined by Dr. Ivan Aralica, a board certified psychiatrist employed by the State of Nevada to examine inmates in the Clark County Jail. Dr. Aralica observed that Haynes was in a catatonic state and noted that Haynes had "marked decrease in motor behavior" but recognized that the doctor was present. At that time, Dr. Aralica determined that Haynes was psychotic and prescribed Haldol.

Eight days after the homicide, on June 12, Dr. Aralica again examined Haynes and doubled the dose of Haldol. On June 19, Dr. Aralica observed that Haynes was less catatonic and less psychotic; he diagnosed Haynes as having a chronic psychotic illness, schizophrenic disorder. On August 6, Dr. Aralica observed Haynes to be catatonic, markedly psychotic and paranoid. On September 5, Dr. Aralica observed that Haynes was withdrawn and in a daze. On September 17, Dr. Aralica observed that Haynes was friendly, loud and disruptive, and that his psychosis was not well controlled.

When asked at trial if he had an opinion of whether Haynes was psychotic on June 4, when the homicide occurred, Dr. Aralica stated that he "never inquired about that" but that his educated guess was that he was "most likely psychotic."

Dr. Aralica testified that symptoms of schizophrenia include persecutorial delusions, ideas which shift from one subject to another with no rational connection, incomprehensible and incoherent speech, a dislike of being touched, "inappropriate affects" such as laughing when admitting killing a person, social withdrawal and preoccupation with himself, and dilated pupils. Dr. Aralica testified in connection with his examination of Haynes that schizophrenics rarely accept the fact that they are schizophrenic or victims of a mental disease.

Haynes has a history of intermittent admissions to mental hospitals in Mississippi, Wisconsin, Illinois, and Florida between February 1982 and December 7, 1984.[1] Dr. Aralica was first able to review the medical records from Illinois and Mississippi at trial; he testified that those records strengthened his opinion that Haynes suffered from paranoid type schizophrenia.

A corrections officer at the jail, James Evans, testified that Haynes's behavior improved with medication. When Evans first saw Haynes in June 1985, Haynes was hostile and unable to communicate.

Dr. William O'Gorman, a psychiatrist originally hired by the defense to determine Haynes's legal sanity at the time of the killing and his competency to stand trial, testified for the prosecution that Haynes knew right from wrong at the time of the killing and knew the nature and quality of his actions. Dr. O'Gorman examined Haynes on three occasions in October for periods totaling less than three hours. Dr. O'Gorman disagreed with the diagnosis of schizophrenia; rather, he diagnosed Haynes as schizoid and antisocial. Dr. O'Gorman testified that Haynes "wanted to get off the street" and that the real reason for his behavior was drug abuse.

At the penalty hearing the jury returned a special verdict finding the aggravating circumstance of "conviction of a felony involving the use or threat of violence to the person of another," namely, a robbery committed by Haynes in 1970, when he was eighteen years old. For evidence of mitigating circumstances, the defense called Dr. Myerson, a clinical psychologist, and Dr. O'Gorman, the state's witness at trial. The jury imposed the death penalty.

### Guilt Phase

First we shall address the validity of the conviction at the guilt phase.

■■■■■

There can be very little doubt that Haynes suffered from a

---

[1]Haynes was involuntarily committed to hospitals in Mississippi and Illinois. The Mississippi records described Haynes as paranoid schizophrenic. The records contain a letter from Haynes to a Mississippi psychiatrist wherein Haynes admitted lying about epilepsy, asthma and hallucinations in order to get a disability check. In Illinois, Haynes was diagnosed as psychotic, antisocial, and schizophrenic, and he was given chemotherapy. An Illinois psychiatrist recorded that Haynes "is overtly psychotic and very prone to agitation; eventually dangerous to others and unable to guard himself from serious harm." Haynes told the Wisconsin hospital that he suffered from epilepsy and mental illness; the Wisconsin psychiatrist wrote in the records: "suspect that this is a scam." Although mentally disordered, Haynes was apparently able to dissemble in order to serve his own ends.

"defect of reason, from disease of the mind,"[2] namely, the "chronic psychotic illness . . . schizophrenic disorder" described by Dr. Aralica. Haynes's defense counsel, however, did not call an expert or lay witness to render an opinion that, under the M'Naghten rule adopted in this state,[3] Haynes did not know, at the time of committing the act, the nature and quality of the act or if he did know it he did not know that what he was doing was wrong.

On this state of the record it is difficult to see how a jury could have come to the conclusion that Haynes had presented a viable insanity defense, particularly in light of the fact that the state presented a categorical and uncontradicted opinion by its expert, Dr. William O'Gorman, that Haynes knew right from wrong at the time of the killing and knew the nature and quality of his acts.

There is no question about Haynes's having struck the death-dealing blows and, absent any real prima facie showing of the defense of insanity, the sole defense, insanity, collapses.

Haynes makes five assertions of error which warrant discussion but which do not alter the propriety of the conviction.

First, Haynes asserts that the district court erred by denying his motion for a continuance on the morning of trial. The purpose of the motion was to allow discovery of medical records and witnesses which would assist in establishing the insanity defense. Upon exercise of discretion to deny a motion for continuance, a district court is instructed by Rule 14 to consider "whether or not the same facts can be proven by other witnesses . . . whose attendance . . . might have been obtained." Banks v. State, 101 Nev. 771, 773, 710 P.2d 723, 725 (1985); see DCR 14(c). In following this guideline, the district court was acting within the bounds of its discretion in denying the motion. The defense counsel could have procured a local expert to examine Haynes to render an opinion on Haynes's legal sanity at the time of the killing. While the medical records might have assisted a local expert in coming to a conclusion, the absence of such records did not of itself preclude a local expert from coming to a conclusion on Haynes's legal sanity.

---

[2]As seen in footnote 1, Haynes is not incapable of guile in seeking admission to mental institutions, but a reading of this record leaves very little doubt that he suffered from serious mental disorders.

[3]For almost a century, the Nevada Supreme Court has applied the M'Naghten test to determine legal insanity. Ford v. State, 102 Nev. 126, 717 P.2d 27 (1986); Criswell v. State, 84 Nev. 459, 443 P.2d 552 (1968); Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965); Kuk v. State, 80 Nev. 291, 392 P.2d 630 (1964); Sollars v. State, 73 Nev. 248, 316 P.2d 917 (1957); Fox v. State, 73 Nev. 241, 316 P.2d 924 (1957); State v. Hartley, 22 Nev. 342, 40 Pac. 372 (1895); State v. Lewis, 20 Nev. 333, 22 P. 241 (1889).

Second, Haynes asserts that the district court erred in denying his motion for individual voir dire. Absent a showing that the district court abused its discretion or that the defendant was prejudiced, this court shall not disturb a district court's determination to conduct a collective voir dire of prospective jurors. Summers v. State, 102 Nev. 195, 718 P.2d 676 (1986) (capital case); *see* Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980); Cunningham v. State, 94 Nev. 128, 575 P.2d 936 (1978); NRS 175.031. While some prospective jurors may be inhibited from speaking frankly about their exposure to and impressions of mental illness, the defense counsel could have asked the trial court during collective voir dire for independent, sequestered voir dire as to any prospective jurors suspected of holding back on this subject matter. The district court did not abuse its discretion, and Haynes has not shown actual prejudice.

Third, Haynes asserts that the district court erred by denying his motion for a mistrial based upon prosecutorial abuse of peremptory challenges. The equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race. Batson v. Kentucky, ...... U.S. ......, 106 S.Ct. 1712 (1986). To establish a prima facie case of purposeful discrimination, the defendant first must show that he or she is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove members of defendant's race from the venire. *Id.* at 1723. Second, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Id.* Third, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire members on account of their race. *Id.* Upon making such a prima facie case, the burden shifts to the state to come forward with a neutral explanation for challenging the racially excluded jurors. *Id.* The state cannot meet this burden on mere general assertions that its officials did not discriminate but must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Id.* at 1721.

Haynes has made out a prima facie case. The prosecutor used six of the eight peremptory challenges. Two of those challenges excused the only two black members of the panel. When asked to give his reasons for excusing those two black veniremen, the prosecution responded that one black venireman indicated on the jury sheet that he was unmarried, but on voir dire he indicated he was married. The trial court made a note of whom the prosecu-

tion was challenging and observed a consistent pattern of state challenges to persons who were "rather young" and who did not have long work experience. The trial court noted that the other black venireman, a high school graduate, was "very young and had been two months unemployed." The state and the trial court, together, have supplied an explanation consistent with neutrality.

Fourth, Haynes asserts that his attorney-client privilege was violated when the state called two psychiatrists as rebuttal expert witnesses who had been originally hired by defense counsel to examine and test Haynes. A defendant's fifth amendment privilege against self-incrimination and sixth amendment right to effective assistance of counsel, as extended to the states by the fourteenth amendment, are not violated when the prosecution calls a defense-retained psychiatrist as a rebuttal witness and when that psychiatrist had not been called as a defense witness. Noggle v. Marshall, 706 F.2d 1408, 1410 (6th Cir.), *cert. denied*, 464 U.S. 1010 (1983).

The attorney-client privilege is not absolute. State v. Bonds, 653 P.2d 1024 (Wash. 1982). The attorney-client privilege rests on the theory that encouraging clients to make full disclosure to their attorneys enables the latter to act more effectively, justly, and expeditiously, a benefit out-weighing the risks posed to truth-finding.[4]

The jurisdictions are split as to whether the attorney-client privilege is violated when a defense-retained psychiatrist, who is not called as a defense witness, is called as a rebuttal witness to give an opinion on the legal sanity of the defendant. Most jurisdictions hold that the attorney-client privilege is violated. United States v. Alvarez, 519 F.2d 1036 (3d Cir. 1975); Houston v. State, 602 P.2d 784 (Alaska 1979); State v. Pratt, 398 So.2d 421 (Md.App. 1979); Pouncy v. State, 353 So.2d 640 (Fla.App. 1977); People v. Lines, 531 P.2d 793 (Cal. 1975); People v. Hilliker, 185 N.W.2d 831 (Mich.App. 1971); *cf.* State v. Kociolek, 129 A.2d 417 (N.J. 1957). Likewise, most courts find

---

[4]The decision of whether the attorney-client privilege may include a communication to a non-lawyer by the lawyer's client contemplates two conflicting forces. United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961) (expert accountant). One is the "investigation of truth and the enforcement of testimonial duty [which] demand the restriction, not the expansion of [all] privileges." 8 Wigmore, Evidence § 2192 at 73 (McNaughton Rev. 1961). The other is that it is absolutely necessary that a person should be able to place unrestricted and unbounded confidence in a professional lawyer. *Kovel*, 296 F.2d at 921.

that the attorney-client privilege is waived only if the defendant calls a psychiatrist as a defense witness or places the psychiatrist's name on a witness list. Tucker v. State, 484 So.2d 1299 (Fla.App. 1986); *see Pratt, supra.*

A few jurisdictions allow admission of the testimony of a defense-retained psychiatrist who has not been called as a defense witness but who has been called as a prosecution witness. State v. Craney, 347 N.W.2d 668, 673 (Iowa), *cert. denied,* 469 U.S. 884 (1984) (opinion testimony on sanity or insanity and testimony of that opinion including non-incriminatory statements by the defendant are admissible); State v. Bonds, 653 P.2d 1024, 1036 (Wash. 1982), *cert. denied,* 464 U.S. 831 (1983) (attorney-client privilege should not extend to testimony of a psychiatrist when the issue of insanity is raised by the defense); People v. Edney, 350 N.E.2d 400 (N.Y. 1976) (a plea of innocence by reason of insanity constitutes a complete and effective waiver by the defendant of *any* claim to the attorney-client privilege); State v. Steinkraus, 417 P.2d 431, 432 (N.M. 1966) (attorney-client privilege applies only to "communications," rather than "facts"; observations and conclusions by a psychiatrist are "facts").

We choose to follow the position that opinion testimony on sanity and testimony of non-incriminatory observations in arriving at that opinion, including non-incriminatory statements by the defendant, are admissible. *Craney,* 347 N.W.2d at 673. Under these principles, an observation or statement is not "incriminatory" merely because it tends to show the defendant is sane. *Id.* None of the statements made by Haynes or observations made of Haynes, to which the psychiatrists testified, incriminated Haynes in the crime of murder.

Finally, Haynes claims that the district court erred in denying his motion for a mistrial because a police officer destroyed his original notes recording the events between the arrest and incarceration of Haynes in jail. Where evidence is lost as a result of inadequate governmental handling, a conviction may be reversed. Wood v. State, 97 Nev. 363, 632 P.2d 339 (1981). This court will reverse only when the appellant shows either (1) bad faith or connivance on the part of the government, or (2) prejudice from its loss. Rogers v. State, 101 Nev. 457, 463, 705 P.2d 664, 669 (1985). Haynes has shown neither prejudice nor bad faith. The police officer prepared a written report dictated from the destroyed notes.

## Penalty Phase

We do find merit in Haynes's claim that his sentence is exces-

sive. This was a "crazy," motiveless killing. Although we have said in Ford v. State, 102 Nev. 126, 717 P.2d 27, that once the defense of insanity has been rejected by the jury, we will not diminish punishment because of evidence regarding mental deficiencies, this case is different from *Ford*. The record in *Ford* discloses an angry, homicidal intent and an unexcused, deliberate, and premeditated mass murder. Here we have a mentally disturbed person lashing out irrationally, and probably delusionally, and striking a person he did not know and probably had never seen before.

The case before us can be compared to Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985), in which we also reduced a death penalty to life without the possibility of parole. Biondi killed a man in a barroom confrontation among strangers in an emotionally charged atmosphere. Biondi had, like Haynes, one previous armed robbery on his record. There is probably less reason to subject Haynes to the death penalty than there was Biondi. It certainly would not be fair to spare Biondi and kill Haynes.

The basis on the record for the jury's death verdict was a single aggravating circumstance, namely, a prior violent act in the form of an armed robbery committed fifteen years prior to this crime when Haynes was eighteen years old.

Haynes is a homeless wanderer who has been in and out of mental institutions for the past four or five years. He has committed a grave and serious offense, but it does not appear to us that it can be properly and justly maintained that this man deserves to die for what he did.

Under Gregg v. Georgia, 428 U.S. 153 (1976), we are required to consider whether the sentence was influenced by passion, prejudice, or any other arbitrary factors; whether the evidence supports the finding of a statutory aggravating circumstance; and, whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[5]

The United States Supreme Court has observed "that under contemporary standards of decency death is viewed as an inappropriate punishment for a substantial portion of convicted first-

---

[5]The state courts are not constitutionally required to conduct proportionality reviews. Pulley v. Harris, 465 U.S. 37 (1984). In 1985, NRS 177.055(2)(d) was amended to abolish the proportionality review requirement; this amendment became effective June 6, 1985. 1985 Nev. Stats. ch. 527 § 1 at 1597-98; Crump v. State, 102 Nev. 158, 162 n. 5, 716 P.2d 1387, 1389 n. 5 (1986). The prohibition against ex post facto laws requires that this court apply the law as it existed when the crime was committed. *Id.* Haynes committed the crime of murder on June 4, 1985, two days before the deadline.

degree murderers." Woodson v. North Carolina, 428 U.S. 280, 296 (1976). It is inappropriate in this case.

We vacate the death penalty and impose a sentence of life imprisonment without the possibility of parole.