*977 OPINION
By the Court,
Shearing, C. J.:
Appellant Roger Morris Chambers was convicted of the murder of Henry Chacon. In addition to convicting Chambers, the jury determined that the State had proven two aggravating circumstances and that the aggravating circumstances were not outweighed by mitigating circumstances. Chambers was sentenced to death.
Chambers now appeals, claiming that the district court erred in failing to suppress his confession to police, that Nevada’s “reasonable doubt” instruction is unconstitutional, that the district court failed to properly admonish the jury, and that the death penalty is excessive in this case. We disagree with Chambers’ contentions that the district court erred at trial, and we affirm the conviction. However, we vacate the sentence of death and impose a sentence of life imprisonment without the possibility of parole.

FACTS

On September 28, 1993, at approximately 9:30 a.m., Chambers entered the emergency area of Washoe Medical Center in Reno. He approached Michelle Lee Moore, a triage assistant in the emergency room, and asked to see a Dr. Rasul. When asked why he was there, Chambers stated: “There’s a dead body in the room.” He then stated that he did not mean to do it.
Mary Jane Driskill, a security officer at Washoe Medical Center, was called to the triage desk, where Chambers was waiting. Because he appeared to be unsteady on his feet, he was taken to a psychiatric room in the emergency department. Driskill patted down Chambers, but no weapons were found. As he was being patted down, Chambers talked about stabbing someone. Driskill thought Chambers was intoxicated, as he was unsteady and his eyes were bloodshot. Driskill saw an open wound on Chambers’ left arm. Chambers said that he was defending himself when he had been stabbed.
Helen Mooney, a registered nurse in the emergency department of Washoe Medical Center, testified that she checked Chambers into the hospital. He told her he had come to the hospital seeking a psychiatric evaluation. Because Mooney smelled alcohol on Chambers’ breath and noted that his speech was rapid and a little disjointed, she became concerned about the level of Chambers’ blood alcohol. Mooney asked Chambers *978 “alert and oriented” questions. Chambers knew who and where he was but thought that the year was 1984 instead of 1993. Mooney administered a breathalyzer test, which showed a blood alcohol level of 0.27 percent.
At about 9:50 a.m., Reno Police Officer Tom Reid was dispatched to Washoe Medical Center. Upon arrival, he met with Mooney. Mooney told Reid that Chambers had asked to see Dr. Rasul and stated that there was a dead body and he did not mean to do it. Officer Reid went to speak with Chambers. When Reid walked into Chambers’ room, he could smell alcohol. Chambers initiated a dialogue with Officer Reid when Reid’s fellow officers, Officer Adam Wygnanski and Reserve Officer Paul Sevscik, entered the room. Chambers said that he had killed someone, that the victim was in the bathtub, and that there was blood everywhere. At first Chambers could not remember the name of the victim but later recalled that it was “Hank” (Chacon). Chambers said that he had stabbed “Hank” multiple times.
Officer Reid testified that Chambers told him that he had caught a bus in San Francisco and that Chacon got on the bus when it stopped in Sacramento. While on the bus, Chambers and Chacon drank some alcohol and inhaled some cocaine. They ended up at Circus Circus in Reno, where they rented one room to share. Chambers told Officer Reid that they went to the room together, but that he went back downstairs and played poker. When he returned to the room he found Chacon smoking heroin. Chambers said he got mad at seeing this, and that Chacon stabbed him with a knife. Officer Sevscik testified that Chambers told him that the knife Chacon used to stab him was part of a set of knives which were found in the room at Circus Circus. Chambers, a cook by trade, owned the knives and used them in his profession. Chambers told Officer Reid that he got the knife away from Chacon and stabbed him back. Chambers repeatedly told the officers that he had stabbed Chacon in self-defense.
Based on Chambers’ statements at the hospital, Officer Wygnanski went to Circus Circus, where he met with a security chief and other hotel personnel. They located the room registered in Chambers’ name, and with the use of the security chief’s master card key, they entered the room. Officer Wygnanski went to the bathroom and saw a man’s body slumped in the bathtub and blood everywhere. He left the room and secured the scene. After obtaining a search warrant, Officer Wygnanski re-entered the room with forensics personnel.
Reno Police Detective Joseph Depczynski was also present at the crime scene. He located a black canvas bag with several pockets holding knives and other kitchen utensils next to the sink on the counter in the bathroom. Also next to the sink he found *979 two crossed black-handled knives. There was some sooty deposit on the crossed knife blades suggesting that they were used to smoke heroin. Additionally, there was a hollow tube that appeared to be paraphernalia used to inhale or sniff drugs.
On the same morning, Reno Police Detective Steve Reed also met with Chambers. Chambers told Detective Reed that Chacon was smoking heroin on his knives and they got into a fight. Around 11:30 a.m., Detective Reed took Chambers into custody and transported him to the Reno Police Department. After placing Chambers in an interview room, the detective made arrangements for a drug recognition expert (DRE) officer to evaluate him.
Detective Reed began questioning Chambers at approximately 12:30 p.m. that day. Prior to questioning him, Detective Reed read Chambers his Miranda rights. Chambers waived his rights. Following that, a DRE officer, Detective John Catalano, came in and examined Chambers. Detective Catalano checked Chambers’ eyes and found that Chambers was incapable of crossing his eyes to follow an object. He also found Chambers’ sluggish reaction to light to be unusual. Detective Catalano testified that Chambers’ speech appeared slow and deliberate. Chambers’ pulse was above normal, his blood pressure was high, and his throat was red and irritated, which would be consistent with inhaling either methamphetamine or crack cocaine. During the examination, Chambers told Detective Catalano that he had smoked some heroin and had consumed about five ounces of vodka and a beer chaser at approximately 8:00 that morning. Detective Catalano noted that, though Chambers’ eyes looked like he had been drinking, Chambers did not seem to be that intoxicated.
Based on the examination, Detective Catalano concluded that Chambers was under the influence of a central nervous system stimulant. Despite Chambers’ assertion, Detective Catalano could find nothing to support Chambers’ admission that he had smoked heroin. At the conclusion of the test Detective Reed and Detective Catalano spoke briefly, then Detective Reed, along with another detective, began questioning Chambers. Chambers was questioned for approximately four hours. During this time, he was provided with cigarettes, water, and coffee, and was offered food, which he rejected. The police department made a videotape and an audiotape of this interview. The district court and the jury viewed relevant portions of the videotape at trial.
After questioning, Chambers was formally booked into the Washoe County jail by Reno Police Department Detective Phillip Jenkins. Detective Jenkins testified that at approximately 3:45 that afternoon he obtained a urine sample from Chambers. At about 4:20 p.m., an officer drew blood from Chambers. At *980 approximately 4:50 p.m. an officer drew more blood, and did so again at 5:20 p.m. Chambers’ blood alcohol level was 0.27 percent right after questioning, and four hours later it was 0.19 percent and descending. Chambers’ urine was found to contain amphetamine, methamphetamine, a trace of morphine, and marijuana metabolite. There were no narcotics found in Chambers’ blood.
Dr. Ellen Clark, a specialist in anatomical, clinical, and forensic pathology, reviewed the autopsy protocol and diagrams of injuries relating to Chacon’s death prepared by her partner Dr. Laubscher. At trial, Dr. Clark testified that Chacon had suffered blunt force injuries and had seventeen stab wounds on his body. Although most of the stab wounds were superficial, she concluded that two were significant: one in the front chest that cut through a portion of the rib, passed through the lung and the sack covering the heart, and one in the back that also passed into the chest and into a lung lobe causing bleeding and the collapse of the lung. The autopsy also indicated that Chacon had ingested heroin or morphine, within two to three hours of his death.
At trial, Chambers was found guilty of first-degree murder. Chambers was sentenced to death based on two aggravating factors: (1) Chambers, who at the time of the trial was thirty-eight years old, had been convicted of two counts of robbery when he was nineteen years old, felonies involving the use or threat of violence, and (2) the murder of Chacon involved torture.
This appeal followed.

DISCUSSION

Admission of Chambers ’ confession to police

Prior to trial, Chambers filed a motion to suppress his post-Miranda statements to police, claiming that his statements were not voluntarily given in light of the fact that he was questioned for four hours after having been stabbed, that he was not well rested, and that he was intoxicated. The district court observed the videotape of the confession and heard testimony at a hearing on the matter. The district court found that at the time Chambers made his statements to police, he did not appear to be under the influence of either alcohol or drugs to such a point that he was unable to understand the questions directed to him and unable to formulate intelligent, logical answers. The district court further found that Chambers knowingly and voluntarily signed the Miranda waiver presented to him. Accordingly, the district court denied the motion to suppress. Chambers argues that the district court erred in failing to suppress his confession to police.
*981 A confession is inadmissible unless freely and voluntarily given. Echavarria v. State, 108 Nev. 734, 742, 839 P.2d 589, 595 (1992); Rowbottom v. State, 105 Nev. 472, 482, 779 P.2d 934, 940 (1989). “In order to be voluntary, a confession must be the product of a ‘rational intellect and a free will.’ ” Passama v. State, 103 Nev. 212, 213-14, 735 P.2d 321, 322 (1987) (quoting Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). In determining whether a confession is the product of a free will, this court employs a totality of the circumstances test:
[t]he court must consider the effect of the totality of the circumstances on the will of the defendant. See Schneckloth v. Bustamonte, 412 U.S. 218, 226-227 (1973). The question in each case is whether the defendant’s will was overborne when he confessed. Id. at 225-226. Factors to be considered include: the youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep. Id. at 226.
Passama, 103 Nev. at 214, 735 P.2d at 323. The question of the admissibility of a confession is primarily a factual question addressed to the district court: where that determination is supported by substantial evidence, it should not be disturbed on appeal. Echavarria, 108 Nev. at 743, 839 P.2d at 595.
Chambers was not subject to any physical coercion or emotional overreaching, since he was given coffee, cigarettes, water, and the offer of food, and was able to articulate reasons why he wished to talk with the officers. He was treated politely by the officers, and the transcript of the interview reveals that no coercive interrogation techniques were employed.
The ultimate issue in the case of an alleged involuntary confession must be whether the will of the accused was overborne by government agents. See Passama, 103 Nev. at 213-14, 735 P.2d at 323. Chambers’ position is not that his will was overborne but that his desire to talk with police was the product of his intoxication and that he was incompetent to waive his rights. In Colorado v. Connelly, 479 U.S. 157 (1986), a mentally ill individual approached a police officer and confessed to murder. The Supreme Court held that the confession was voluntary because it was not the product of police coercion but was the product of the defendant’s personal compulsion. Id. at 167. Similarly, Chambers walked into the hospital and started telling anyone who would listen that there was a dead body in his hotel room. *982 Moreover, Chambers indicated several times that he wanted to talk to police in order to make his self-defense case known.
Chambers appears to have been relatively coherent and to have had an understanding of what was going on, often talking “legalese” with police. Substantial evidence supports the district court’s determination that Chambers’ statements were voluntarily given and that he knowingly and intelligently waived his Miranda rights. Therefore, we conclude that the district court did not err in admitting Chambers’ confession to police.

The constitutionality of Nevada’s statutory “reasonable doubt” instruction

During the settlement of jury instructions, Chambers objected to the proposed reasonable doubt instruction, which was based on the provisions of NRS 175.211. The instruction informed the jury that “reasonable doubt” is such doubt “as would govern or control a person in the more weighty affairs of life.” Chambers asserts that this portion of the reasonable doubt instruction is unconstitutional on the grounds that the instruction involves a “risk-taking” analysis that is wholly unlike the decision that a jury must make in a criminal case. Chambers compares this language to the “hesitate to act” language, of which Justice Ginsburg stated:
A committee of distinguished federal judges . . . has criticized this “hesitate to act” formulation
“because the analogy it uses seems misplaced. In the decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed, decisions we make in the most important affairs of our lives— choosing a spouse, a job, a place to live, and the like— generally involve a very heavy element of uncertainty and risk-taking. They are wholly unlike the decisions jurors ought to make in criminal cases.”
Victor v. Nebraska, 511 U.S. 1, 24, (1994) (Ginsburg, J., concurring) (quoting Federal Judicial Center, Pattern Criminal Jury Instructions 18-19 (1987) (commentary on instruction 21)). Chambers argues that the same can be said of Nevada’s “weighty affairs of life” formulation of “reasonable doubt.” Chambers asserts that the instruction tends to diminish the prosecution’s burden of proof and that the giving of this instruction thus violated his due process rights.
This court has addressed the constitutionality of Nevada’s statutory instruction on “reasonable doubt” many times, con- *983 eluding that it meets constitutional standards. See Hutchins v. State, 110 Nev. 103, 112, 867 P.2d 1136, 1142 (1994); Echavarria, 108 Nev. at 742, 839 P.2d at 594; Riley v. State, 107 Nev. 205, 214, 808 P.2d 551, 556 (1991); Lord v. State, 107 Nev. 28, 40, 806 P.2d 548, 556 (1991). Chambers cites no case law which compels another result. The judge instructed the jury that the prosecution had the burden of proving both act and intent beyond a reasonable doubt and that the prosecution must establish proof of every element of the crime beyond a reasonable doubt. Accordingly, we conclude that Chambers’ argument lacks merit.

The district court’s failure to admonish the jury on four occasions

The trial transcript reveals several instances where the district court failed to fully admonish the jury when the jury adjourned. Chambers argues that the district court committed reversible error by failing to admonish the jury before each adjournment, as required by NRS 175.401.[1]
The record shows that the district court did fully admonish the jury before every recess of any major length of time in this eight-day trial. In the four instances pointed out by Chambers, the district court was allowing a recess of only a few minutes, and the court reminded the jury that its prior admonishments continued to apply to even brief recesses. Thus, we conclude that contrary to Chambers’ assertions, the district court complied with the provisions of NRS 175.401 and that the failure to fully admonish the jury before the noted recesses does not warrant reversal.

Penalty phase

Under NRS 177.055(2), this court is obligated to review the sentence of death to determine whether the evidence supports the finding of aggravating circumstances, whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor, and whether the sentence of death is excessive, considering both the crime and the defendant.
*984 The jury found two aggravating circumstances: (1) Chambers had previously been convicted of a felony involving the use or threat of violence, and (2) the murder involved torture. The first aggravating circumstance was supported by substantial evidence, including a record of Chambers’ two prior convictions for robbery and the testimony of the victim of a robbery that Chambers committed in 1975.
However, the evidence presented does not support a finding beyond a reasonable doubt that the murder involved torture.
There was no evidence of any intent by Chambers to torture Chacon. In Domingues v. State, 112 Nev 683, 702, 917 P.2d 1364, 1377 (1996), this court held that torture can be found only if there is specific intent to inflict pain for pain’s sake or for punishment or sadistic pleasure. There is no dispute that Chambers killed Chacon, and the evidence certainly supports a conclusion that Chambers was in a murderous rage, but that evidence does not show beyond a reasonable doubt that Chambers had a specific intent to torture Chacon.
The evidence is far more consistent with there having been a fight between Chambers and Chacon after Chambers came upon Chacon burning heroin on Chambers’ chef’s knives, his professional tools. The evidence showed not only that Chacon had been stabbed by Chambers, but that Chacon had also stabbed Chambers. Although the pathologist testified that there were seventeen stab wounds on Chacon’s body, she said most of them were superficial, only two being significant. The evidence of the type of knife wounds on Chacon and the fact that Chambers also suffered knife wounds was consistent with there having been a fight between Chambers and Chacon, as Chambers maintained, not with any desire or attempt on the part of Chambers to torture Chacon.
Pursuant to our obligation under NRS 177.055(2) to review the record independently, we see no evidence that the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor. However, under our obligation to review the record to determine whether the sentence of death is excessive considering the crime and the defendant, we conclude, after comparing the circumstances of the murder and the defendant in this case with the circumstances in other cases in which this court has affirmed the death penalty, that imposition of the death penalty here is excessive.
One factor contributing to our conclusion that the death penalty *985 is excessive is that one of the aggravating circumstances was not supported by the evidence. Also, the other aggravating factor, the prior convictions, referred to crimes that occurred eighteen years before the verdict in question, when Chambers was eighteen years old. This hardly shows a pattern of violence sufficient to justify the death penalty.
The circumstances in this case are much more similar to those in Biondi v. State, 101 Nev. 309, 699 P.2d 1062 (1985), and Haynes v. State, 103 Nev. 309, 739 P.2d 497 (1987), in which this court found the death penalty excessive, than to any of the numerous death penalty sentences which this court has upheld.
Apparently, a drunken Chambers came upon Chacon burning heroin on Chambers’ chef’s knives, his professional tools, at which Chambers became angry. According to Chambers’ testimony, when he confronted Chacon, Chacon stabbed Chambers with a knife. Chambers was able to get the knife away and responded by stabbing Chacon. The physical evidence appears to be consistent with most of Chambers’ version of events, although there was certainly sufficient evidence for the jury to conclude that the killing was not justified as self-defense. It appears that he could well have been reacting in anger, and overreacted in view of his intoxicated state. Voluntary intoxication certainly does not excuse a vicious crime, but it does indicate that the murder was not planned in advance and that it resulted from the emotionally charged confrontation in which Chambers was wounded and his professional tools were being ruined.
Chambers certainly deserves to be punished for his crime, but, based on the strict standards that have been adopted for the imposition of the death penalty, capital punishment is excessive. In Haynes, this court stated:
The United States Supreme Court has observed “that under contemporary standards of decency death is viewed as an inappropriate punishment for a substantial portion of convicted first-degree murderers.”
Id. at 319-20, 739 P.2d at 504 (quoting Woodson v. North Carolina, 428 U.S. 280, 296 (1976)). Given the unique circumstances of this case, a sentence of life without the possibility of parole is more appropriate than a death sentence.
For the foregoing reasons, we affirm the judgment of conviction, vacate the sentence of death and impose a sentence of life without the possibility of parole.
Springer and Rose, JJ., concur.[2]

 NRS 175.401 states, in relevant part:
At each adjournment of the court . . . [the jurors] must be admonished by the judge or another officer of the court that it is their duty not to:
1. Converse among themselves or with anyone else on any subject connected with the trial;
2. Read, watch or listen to any report of or commentary on the trial or any person connected with the trial by any medium of information, including without limitation newspapers, television and radio; or
3. If they have not been charged, form or express any opinion on any subject connected with the trial until the cause is finally submitted to them.