OPINION
 

 By the Court,
 

 Becker, J.:
 

 The State charged appellant Terry Jess Dennis by information with one count of first-degree murder with the use of a deadly weapon for the March 1999, willful, deliberate and premeditated strangulation murder of Ilona Straumanis. The State subsequently filed a notice of intent to seek the death penalty.
 

 On April 16, 1999, Dennis entered a guilty plea, pursuant to a written plea agreement, to first-degree murder with the use of a
 
 *1077
 
 deadly weapon. A penalty hearing was conducted before a three-judge panel. The panel found that three alleged aggravators (three prior felony convictions involving the use or threat of violence to the person of another) were proved beyond a reasonable doubt. The panel also found two mitigating circumstances existed: Dennis was under the influence of alcohol when he killed Straumanis, and he suffers from mental illness. The panel concluded that the mitigating circumstances did not outweigh the aggravating circumstances and returned a verdict of death.
 

 Dennis argues only that his sentence of death is excessive. We affirm.
 

 FACTS
 

 On the afternoon of March 9, 1999, Dennis, who was fifty-two years old, unemployed and homeless, telephoned the Reno Police Department (“RPD”) Dispatch, and told a dispatcher that he had killed a woman and her body was in his room at a local motel. Dennis stated that he was in the same room watching television and would wait for police to arrive. Dennis also stated that dispatchers should send a coroner, as “[t]he bitch ha[d] been dead for three or four days.”
 

 An RPD detective responded to Dennis’s motel room, contacted Dennis, and asked whether he had any weapons. Dennis stated that he had used his hands to kill the victim and did not have any weapons. He agreed to be interviewed and was transported to the police department.
 

 At the police department, detectives advised Dennis of his Miranda
 
 [1]
 
 rights. Dennis waived his rights and agreed to be interviewed. When questioned about the murder, Dennis stated that his memory was unclear on certain details because he had consumed about a fifth of vodka a day for the past week.
 
 [2]
 

 During the interview, Dennis reported the following. He had been staying at the motel where the murder occurred since March 3, 1999. Two or three nights into his stay, he left his room to go to a local saloon. On his way to the saloon, he met the victim, who was later identified as Ilona Straumanis, a fifty-six-year-old woman. Straumanis had bruises about her eyes and told Dennis that she had been beaten by another man. Straumanis accompanied Dennis to the saloon, and later, to Dennis’s motel room. Thereafter and until the murder, both Dennis and Straumanis remained in an intoxicated state, staying in Dennis’s room, except for a shared meal out and Dennis’s outings to get more alcohol.
 

 
 *1078
 
 On the day he killed Straumanis, he left the room briefly because Straumanis was asking too many personal questions. Upon his return to the room, he and Straumanis engaged in a conversation about whether Dennis had ever killed anyone. Straumanis accused Dennis of being too kind to be capable of killing. Dennis then killed Straumanis, as he and she were “sort of” “making love.”
 

 He began strangling Straumanis with a belt. He felt somewhat aroused by Straumanis’s struggling, and as she was “fading,” he engaged in anal intercourse with her. During the course of the killing, he took the belt off and used his hands to choke her, and then suffocated her by covering her nose and mouth, making sure that she was not breathing and that “it was all done.” He was not certain whether he finished the sexual act once she was dead. It took five or ten minutes to kill Straumanis, and Dennis checked her pulse afterward. He felt that he “had to make sure,” so he “took [his] time.”
 

 After the murder, Dennis covered Straumanis’s body and slept in the other bed. Prior to contacting police, Dennis also left the room at times to go to a local casino or the store for more liquor.
 

 Dennis admitted that, although he had been drinking heavily prior to the murder and had stopped taking the medications prescribed for his mental health problems, he knew “exactly what [he] was doing” at the time of the murder. He killed Straumanis primarily because she challenged whether he was capable of killing, but also in response to a challenge from Straumanis regarding his sexual performance, which was affected by his drinking, and because he knew that he could kill her — she was “nobody” to him. He explained that he was probably thinking that Straumanis needed to be “put out of her misery” from the time he first met her and realized that she was “pathetic.” He stated, “[W]hen I first met her, I had that . . . idea that if you know I can talk her into . .'. coming back to my crib then done deal. Done deal.” He saw himself as a “predator” and Straumanis as a “victim,” and he felt that killing her was “the thing to do.” Dennis had recently “picked up” another woman, intending to do the same thing to her, but she got frightened and left him before he could finish. From that experience he had learned to “[flake it a little slower,” and he did so with Straumanis, trying to charm her into staying with him. Dennis was determined to kill Straumanis regardless of whether she survived his initial attack. He had been wanting to kill someone for a long time, and he felt at peace with killing Straumanis. Dennis stated that he did not care about anybody, including himself. He knew murder was wrong and did not care. Dennis also told detectives, “[I]f I didn’t get stopped this would not be the last time that
 
 *1079
 
 I would do something like this, because I found it exciting. I actually enjoyed it.”
 

 At the conclusion of the interview, detectives formally placed Dennis under arrest.
 

 Meanwhile, another RPD detective searched Dennis’s motel room pursuant to a search warrant. There, the detective discovered Straumanis’s nude dead body underneath a blanket on one of the two beds in the room. Straumanis’s body was found in a prone position with spread legs. A pillow underneath Straumanis’s pelvis caused her buttocks to protrude upward. The detective also discovered a leather belt on the floor of the motel room and numerous empty beer and Vodka containers, along with other debris.
 

 An autopsy performed on Straumanis’s body on March 10, 1999, showed that she had died between three and seven days earlier as a result of asphyxia due to neck compression, most likely by strangulation. Straumanis’s neck bore a rectangular-shaped injury. Other injuries were determined to have occurred sometime within the few days prior to her death, including a small abrasion on the forehead, a bruise on the back of one thigh, and a fractured sternum. Changes caused by decomposition of Straumanis’s body made determination of the existence of any sexual assault difficult. Although Straumanis’s anus was dilated, there was no evidence of injury to the perianal skin or distal rectum. Testing revealed that Straumanis had a blood alcohol content of 0.37.
 

 The State charged Dennis by information with one count of first-degree murder with the use of a deadly weapon. The State subsequently filed a notice of intent to seek the death penalty, alleging four aggravating circumstances: that Dennis subjected Straumanis to nonconsensual sexual penetration immediately before, during or immediately after the commission of the murder, and that Dennis had been previously convicted of three separate felonies involving the use or threat of violence to the person of another — a 1979 conviction for second-degree assault, a 1984 conviction for second-degree assault, and a 1984 conviction for second-degree arson.
 

 Counsel were appointed to represent Dennis and arranged to have a psychiatrist conduct a competency evaluation. The psychiatrist who conducted the evaluation concluded that, although Dennis was clinically depressed, he was competent to stand trial and assist in his defense.
 

 On April 16, 1999, Dennis entered a guilty plea to first-degree murder with the use of a deadly weapon pursuant to a written plea agreement. The district court thoroughly canvassed Dennis, who stated his desire to plead guilty though he faced a possible death penalty. Dennis explained that he had been in prison twice before
 
 *1080
 
 and did not consider living in prison to be “living at all.” He did not want to “waste away” in prison for the remainder of his life, and would rather “get it over faster than that.” Ultimately, the court accepted Dennis’s plea, finding that Dennis was competent to enter a plea and that his plea was knowing and voluntary.
 

 On July 19 and 20, 1999, a penalty hearing was conducted before a three-judge panel of the district court. The State presented evidence relating to the facts and circumstances of Straumanis’s death, including Dennis’s own statements regarding the crime and evidence in support of the alleged aggravating circumstances. The panel was also informed that Dennis had a total of nine prior convictions: the three prior felony convictions alleged as aggravators, for which he served approximately two and one-half years in prison, and another older felony conviction for possession of a controlled substance, for which he served two years in prison. Dennis also had five prior misdemeanor convictions.
 

 Dennis agreed to permit counsel to argue for a sentence less than death and submit a sentencing memorandum along with medical, psychiatric and jail records.
 
 [3]
 
 However, he expressed to the panel that he did not want to live in prison for the rest of his life, and he declined to present any additional evidence in mitigation or make any further statement in allocution.
 

 Dennis’s records together with the panel’s questioning of Dennis show that Dennis has a lengthy history of alcohol and substance abuse as well as suicide attempts. He first attempted suicide in 1965 and was hospitalized. However, it does not appear that Dennis was diagnosed with or treated for any mental health disorders until thirty years later. In 1995, he began a series of contacts with mental health professionals and was diagnosed with various disorders — primarily, a chronic depressive disorder.
 
 [4]
 
 The same records show that Dennis was treated for his problems at various facilities by means of prescription drugs and therapy. Although he enjoyed periods of improved well being, he repeatedly discontinued his medications, declined further treatment and continued to consume alcohol against his doctors’ advice.
 

 
 *1081
 
 Included among the medical records submitted were Veteran’s Administration (“VA”) records, which indicate that two months prior to killing Straumanis, Dennis was admitted to the VA Hospital in Reno when he reported to medical staff that he had stopped taking his medications and was trying to drink himself to death. He also reported picking up a girl the previous night, taking her to a motel, and having thoughts of killing her. At the time he was admitted, Dennis exhibited bizarre behavior, talking and answering to himself. However, he was discharged from the hospital after eight days. Reports from follow-up visits with VA medical personnel in February and on March 2, 1999, show no indication of any alarming behavior by Dennis and further show that he denied wanting to harm himself or others.
 

 Counsel argued against a death sentence and alleged as mitigating factors that the murder was committed while Dennis was under the influence of extreme mental or emotional disturbance,
 
 see
 
 NRS 200.035(2), as well as numerous other circumstances,
 
 see
 
 NRS 200.035(7). The panel found that Dennis made a knowing and voluntary waiver of the right to present further mitigating evidence or make any further statement in allocution.
 

 After hearing argument, the panel found that three of the four alleged aggravators were established: the three prior felony convictions. The panel also found two mitigating circumstances: Dennis was under the influence of alcohol when he killed Straumanis, and he suffers from mental illness. The panel concluded that the mitigating circumstances did not outweigh the aggravating circumstances and returned a verdict of death. Dennis timely appealed.
 

 DISCUSSION
 

 Dennis argues only that his sentence of death is excessive. However, where a sentence of death has been imposed, NRS 177.055(2) requires this court to review the record and consider in addition to any errors enumerated on appeal:
 

 (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (d) Whether the sentence of death is excessive, considering both the crime and the defendant.
 

 We address each of these considerations in turn.
 

 Whether the evidence supports the three-judge panel’s finding of aggravating circumstances
 

 The panel found that the State had proved three aggravating cir
 
 *1082
 
 cumstances: three prior felony convictions involving the use or threat of violence to the person of another.
 
 See
 
 NRS 200.033(2)(b).
 

 The record shows that in support of the 1979 felony assault conviction alleged as an aggravator, the State presented police reports, a certified copy of the judgment of conviction from the State of Washington, and testimony from the assault victim. This evidence showed that in December 1978, Dennis became intoxicated, argued with his girlfriend over his unemployment and threatened to kill her. He then held her up against a door and put a knife to her neck. During the altercation, he ripped the knife blade through her hand, saying, “[H]urts, don’t it?” Although she managed to escape, the attack left her hand scarred. Police subsequently arrested Dennis at a local barroom frequented by him. He was thereafter convicted of second-degree felony assault and sentenced to a ten-year term of imprisonment, suspended for a five-year term of probation.
 

 In support of the 1984 felony assault and felony arson convictions, each alleged as aggravators, the State presented police reports, certified copies of the judgments of conviction from the State of Washington, and testimony from victims. This evidence showed that in December 1983, Dennis had a personal relationship with a woman, “Bonnie,” whose daughter, “Lana,” was sixteen years old. Lana and Dennis had been involved in a dispute stemming from an incident when Dennis went on a “rampage” and kicked in the door of Bonnie’s home while Lana and her siblings were present. A couple of days after this incident, Lana was at the home of a family friend. As the two were watching television and eating dinner, Dennis lit the home on fire. When Lana became aware of the fire, she contacted police.
 

 When confronted by police responding to the arson report, Dennis acted as if he did not know what had precipitated a police response. He then swung a knife at an officer. Even after surrounded by five officers, he refused to drop the knife, saying that he wanted to make a point. He made menacing gestures with the knife toward each of the responding officers and threatened to stab anybody who tried to take his knife. He challenged the officers to shoot him and challenged a canine officer to let his dog loose so that Dennis could stab the dog. Dennis then lunged and thrust his knife at the canine officer, and was shot. Notably, although Dennis smelled of alcohol at the time of his arrest, the arresting officer reported there was no indication that Dennis was intoxicated or not in control of himself at the time of the assault. Dennis was convicted of one count each of second-degree assault and second-degree arson. He was sentenced to ten years of imprisonment on each count, to be served concurrently with each
 
 *1083
 
 other, and consecutively to the sentence for the 1979 assault conviction, for which his probation was revoked.
 

 We conclude that this evidence is sufficient to prove each of the three aggravating circumstances found by the panel.
 
 See generally
 
 Parker v. State, 109 Nev. 383, 393, 849 P.2d 1062, 1068 (1993).
 

 Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor
 

 The panel considered evidence of the crime, the background and characteristics of Dennis, and both the aggravating and mitigating circumstances. The panel then concluded that the aggravating circumstances outweighed the mitigating and a death sentence was appropriate. Our review of the record reveals no evidence that the panel imposed the death sentence under the influence of passion, prejudice or any other arbitrary factor.
 

 Whether the sentence of death is excessive
 

 Dennis contends that his sentence of death is excessive. He asks this court to compare his background, character, crime, and the mitigating and aggravating circumstances found in his case to those of defendants in other first-degree murder cases where we have either affirmed the judgment of death or determined the death penalty to be excessive. He contends that under this comparative review, his death sentence must be vacated because the relevant sentencing factors in his case are most similar to those in two cases where we concluded that the death penalties were excessive: Haynes v. State, 103 Nev. 309, 739 P.2d 497 (1987), and Chambers v. State, 113 Nev. 974, 944 P.2d 805 (1997).
 

 The State argues that the comparative review sought by Dennis is unnecessary and suggests that such a review is tantamount to proportionality review, which was formerly required by NRS 177.055(2)(d), but was abolished by our Legislature in 1985.
 
 See
 
 1985 Nev. Stat., ch. 527, § 1, at 1597.
 

 Thus, we must determine whether the comparative review of death penalty cases has any proper role in our excessiveness analysis under NRS 177.055(2)(d). From 1977 through 1985, NRS 177.055(2)(d) required that on appeal from a judgment of death, this court must consider “[wjhether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in this state, considering both the crime and the defendant.” 1977 Nev. Stat., ch. 585, § 10, at 1545; 1985 Nev. Stat., ch. 527, § 1, at 1597. Proportionality review required “that we compare all [similar] capital cases [in this state], as well as appealed murder cases in which the death penalty was sought but not imposed, and set aside those death sentences which appear comparatively
 
 *1084
 
 disproportionate to the offense and the background and characteristics of the offender.” Harvey v. State, 100 Nev. 340, 342, 682 P.2d 1384, 1385 (1984).
 

 However, in 1984, the United States Supreme Court decided Pulley v. Harris, 465 U.S. 37, 43-44, 50-51 (1984), holding that the Eighth Amendment to the United States Constitution
 
 [5]
 
 does not require a proportionality review of death sentences,
 
 i.e.,
 
 an inquiry into whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others similarly situated. The following year, the Nevada Legislature amended NRS 177.055(2)(d) to repeal the proportionality review requirement.
 
 See
 
 1985 Nev. Stat., ch. 527, § 1, at 1597. In its current form, NRS 177.055(2)(d) provides only that this court must consider on appeal from a judgment of death “[w]hether the sentence of death is excessive, considering both the crime and the defendant.”
 

 We have recognized that pursuant to the 1985 amendment to NRS 177.055(2)(d), this court no longer conducts proportionality review of death sentences.
 
 See, e.g.,
 
 Thomas v. State, 114 Nev. 1127, 1148, 967 P.2d 1111, 1125 (1998),
 
 cert. denied, 528
 
 U.S. 830 (1999); Guy v. State, 108 Nev. 770, 784, 839 P.2d 578, 587 (1992). Instead, we review a death penalty for excessiveness considering only the crime and the defendant at hand.
 
 Guy,
 
 108 Nev. at 784, 839 P.2d at 587.
 

 In dispensing with proportionality review, we have recognized that penalties imposed in other similar cases in this state are “irrelevant” to the excessiveness analysis now required by NRS 177.055(2)(d).
 
 See id.
 
 Nonetheless, we have not entirely abandoned comparative review as part of that analysis. As noted by Dennis, in
 
 Chambers,
 
 113 Nev. at 984-85, 944 P.2d at 811-12, we considered whether the imposition of a death sentence was warranted based upon comparisons between Chambers and his crime and defendants and crimes in other cases in which we have reviewed judgments of death. Specifically, we compared and found that the circumstances of the crime and defendant in
 
 Chambers
 
 were similar to those in two cases where we had determined the death penalty was excessive:
 
 Haynes
 
 and Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985).
 
 Chambers,
 
 113 Nev. at 985, 944 P.2d at 811. We also compared “the circumstances of the murder and the defendant in [Chambers] with the circumstances in other cases in which this court has affirmed the death penalty.”
 
 Id.
 
 at 984, 944 P. 2d at 811. After considering the crime and defendant in
 
 Chambers,
 
 and in light of our comparative
 
 *1085
 
 review, we ultimately concluded that the sentence of death was excessive.
 
 Id.
 
 at 984-85, 944 P.2d 811-12.
 

 Nonetheless,
 
 Chambers
 
 does not stand for the proposition that this court will conduct proportionality review of death sentences as part of the excessiveness analysis despite the Legislature’s abol-ishment of such review. The fact that others guilty of first-degree murder may have received greater or lesser penalties does not mean that a defendant whose crime, background and characteristics are similar is entitled to receive a like sentence. However, as apparent in
 
 Chambers,
 
 our determinations regarding excessiveness of the death sentences of similarly situated defendants may serve as a frame of reference for determining the crucial issue in the excessiveness analysis: are the crime and defendant before us on appeal of the class or kind that warrants the imposition of death?
 
 See
 
 NRS 177.055(2)(d) (court must consider whether sentence of death on appeal is excessive, “considering both the crime and the defendant”). This inquiry may involve a consideration of whether various objective factors, which we have previously considered relevant to whether the death penalty is excessive in other cases, are present and suggest the death sentence under consideration is excessive.
 

 We conclude that, even using as a frame of reference the factors considered relevant to excessiveness in
 
 Chambers
 
 and
 
 Haynes,
 
 the cases upon which Dennis relies, the death penalty is not excessive here.
 

 In
 
 Haynes,
 
 we relied on several objective factors to determine that the death sentence was excessive,
 
 i.e.,
 
 the killing in that case was “ ‘crazy’ ” and “motiveless”; the defendant, Haynes, was a “mentally disturbed person lashing out irrationally, and probably delusionally, and striking a person he did not know and probably had never seen before”; and the single aggravating circumstance, a prior felony conviction for armed robbery, was fifteen years old at the time of the crime and committed by Haynes when he was eighteen years old. 103 Nev. at 319, 739 P.2d at 503. We concluded that the case was comparable to Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985), where the defendant killed a man in a barroom confrontation among strangers in an emotionally charged atmosphere, and where the only aggravating circumstance was a prior conviction for armed robbery.
 
 [6]
 

 Haynes,
 
 103 Nev. at 319, 739 P.2d at 503. We noted that in
 
 Biondi,
 
 we had reduced
 
 *1086
 
 the death sentence to life without the possibility of parole.
 
 [7]
 

 Id.
 
 We finally concluded that Haynes did not deserve the death penalty.
 
 Id.
 

 As noted previously, we likewise determined the sentence of death was excessive in
 
 Chambers,
 
 after concluding the case was comparable to
 
 Haynes
 
 and
 
 Biondi. Chambers,
 
 113 Nev. at 984-85, 944 P.2d at 811-12. In doing so, we relied on several objective factors, including that Chambers murdered the victim in a drunken state, which indicated no advanced planning, during an emotionally charged confrontation in which Chambers was wounded and his professional tools were being ruined.
 
 Id.
 
 at 985, 944 P.2d at 811-12. We further noted that the only valid aggravating factor in
 
 Chambers,
 
 prior felony convictions for robberies, “referred to crimes that occurred eighteen years before the verdict in question, when Chambers was eighteen years old,’ ’ which ‘ ‘hardly shows a pattern of violence sufficient to justify the death penalty.”
 
 Id.
 
 at 984-85, 944 P.2d at 811.
 

 Considering Dennis and his crime, we conclude that the objective factors relied on in
 
 Haynes
 
 and
 
 Chambers
 
 do not indicate the death penalty is excessive here. Dennis deliberately strangled Straumanis over the course of five to ten minutes and made efforts to assure her death. Unlike the defendants in
 
 Haynes
 
 and
 
 Chambers,
 
 evidence here shows a high degree of callousness and premeditation by Dennis. Dennis disputes this on appeal, suggesting that the evidence obtained during his interview with RPD should be discounted because much of what he said during his interview was “puffing” and “macho-image making,” designed to make detectives take seriously his desire to be put to death.
 
 [8]
 
 However, Dennis’s account of the crime is not inconsistent with the physical evidence. No evidence indicates that Dennis exaggerated the willful, premeditated and deliberate nature of the crime or that his callous indifference toward Straumanis was contrived. No evidence shows that the killing was the result of uncontrollable, irrational or delusional impulses or occurred during an emotionally charged physical confrontation. Accordingly, neither Dennis’s mental illness nor his being under the influence of alcohol at the time of the crime renders his death penalty excessive.
 
 Cf.
 
 DePasquale v. State, 106 Nev. 843, 803 P.2d 218
 
 *1087
 
 (1990) (death sentence not excessive although defendant had history of mental illness); Geary v. State, 115 Nev. 79, 977 P.2d 344 (1999) (death sentence not excessive where defendant was in drunken rage when he killed victim),
 
 cert. denied,
 
 529 U.S. 1090 (2000).
 

 Further, in this case, the prior felony convictions found as aggravating circumstances demonstrate that Dennis is a dangerous and violent man. There is no indication that these crimes were committed during any physical confrontation or that Dennis was irrational, delusional or unable to control his actions at the time. One of the aggravating prior felonies was committed twenty-one years, and the others, sixteen years, before Straumanis’s murder. Unlike the single valid prior felony aggravating circumstance in Haynes or
 
 Chambers,
 
 here the prior felonies are not isolated instances, but are part of a continuing pattern of violence, spread out over time and increasing in severity. Also, Dennis committed his first prior felony when in his early thirties and committed his second and third prior felonies when in his late thirties. Therefore, these felonies demonstrate Dennis’s proclivity for violent crime, and their significance in this respect cannot reasonably be diminished by immature judgment at the time of the crimes.
 

 The record demonstrates that Dennis committed a calculated, cold-blooded and unprovoked killing and has a propensity toward violent behavior. We have affirmed the death penalty in similar cases.
 
 See, e.g.,
 
 McKenna v. State, 114 Nev. 1044, 968 P.2d 739 (1998),
 
 cert. denied,
 
 528 U.S. 937, 120 S. Ct. 342 (1999);
 
 see also
 
 Leslie v. State, 114 Nev. 8, 952 P.2d 966,
 
 cert. denied,
 
 525 U.S. 860 (1998); Pellegrini v. State, 104 Nev. 625, 764 P.2d 484 (1988). After considering Dennis’s contentions on appeal, we conclude that the death penalty is not excessive in this case.
 

 CONCLUSION
 

 Our review of this appeal demonstrates that the evidence supports the finding of aggravating circumstances, the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor, and the sentence of death is not excessive, considering Dennis and his crime. Accordingly, we affirm the judgment of conviction and sentence of death.
 

 Rose, C. J., Young, Maupin, Shearing, Agosti and Leavitt, J J., concur.
 

 [1]
 

 Miranda v. Arizona, 384 U.S. 436 (1966).
 

 [2]
 

 following the interview, Dennis’s blood alcohol level was tested and determined to be .112 and descending. However, Dennis does not dispute the knowing and voluntary nature of his statements.
 

 [3]
 

 The State stipulated to the admission of the memorandum and documents offered by the defense to show mitigation.
 

 [4]
 

 Beginning in 1995, Dennis began a series of hospitalizations and outpatient treatments for various problems including Hepatitis C, alcohol abuse, recurrent depressive disorder, suicidal ideation and attempts, antisocial personality disorder, post-traumatic stress disorder attributed to abuse Dennis reported suffering as a child, bipolar disorder, and anger management problems. In 1995, Dennis also reported having audio hallucinations and was diagnosed with having a substance-induced psychotic disorder at the time of one admission for hospitalization. When receiving medical treatment subsequent to 1995, however, Dennis denied having any hallucinations, and it does not appear that Dennis’s care providers noted any indications to the contrary.
 

 [5]
 

 U.S. Const. amend. VIH.
 

 [6]
 

 Although
 
 Haynes
 
 was decided after the Legislature abolished proportionality review, we nevertheless conducted such a review because the crime in that case was committed two days before proportionality review was abolished.
 
 Haynes,
 
 103 Nev. at 319 n.5, 739 P.2d at 504 n.5.
 

 [7]
 

 In
 
 Biondi,
 
 we vacated the death sentence of the defendant because the penalty was disproportionate to sentences received in similar cases, including the codefendant’s case.
 
 Biondi,
 
 101 Nev. at 258-60, 699 P.2d at 1066-67.
 

 [8]
 

 In support of this, he points to his statements during the interview showing that at the time of the interview, he was suffering the effects of alcohol withdrawal, and his statements exaggerating his prior military experience and falsely indicating that he had killed others before Straumanis.