RAY, J.
Before the court is a petition filed by members of the news media for review of orders excluding the press from portions of jury selection proceedings held as part of a high-profile criminal prosecution. The petition alleges that the exclusions infringed upon the media’s right of access to criminal trial proceedings guaranteed by the First and Fourteenth Amendments of the United States Constitution. We agree with Petitioners in part, and we vacate the orders discussed below.
I.
The instant petition arises from the prosecution of Respondent Michael Dunn in Duval County on one count of murder in the first degree, three counts of attempted murder in the first degree, and one count of shooting or throwing a deadly missile. Mr. Dunn fired shots into an SUV containing four black teenagers, fatally shooting one of them, during a dispute over loud music. At trial, Mr. Dunn claimed self-defense, alleging that the teenagers had threatened him. He was found guilty of three counts of the lesser-included offense of attempted second-degree murder and the single count of shooting or throwing a deadly missile. The jury could not reach a verdict on the first-degree murder charge, and a mistrial was declared as to that count. Mr. Dunn’s retrial has currently been scheduled for May 5, 2014.
The prosecution of Mr. Dunn has been highly publicized with his first trial receiving significant media attention. Petitioners contend that the weekend before trial, they learned that the media would not be permitted to attend the voir dire examination of the prospective jurors, but would instead be placed in a separate room with an audio feed from the courtroom. Petitioners appeared at the beginning of trial and objected to the media’s physical exclusion from jury selection, arguing that the public and the press have a right to be physically present at all phases of the trial, including jury selection, under the First and Fourteenth Amendments. The media contended that the audio feed was an insufficient substitute for the media’s ability to visually observe the demeanor and nonverbal reactions and interactions of the judge, the attorneys, and the prospective jurors. Petitioners suggested that the media could arrange to have a limited number of media representatives present in the courtroom if seating capacity was a concern.
*774 The trial judge responded that he thought this arrangement had been previously agreed to by the media months ago through its representatives on the court’s “media committee.”[1] The trial court concluded that it would be logistically impossible to accommodate all of the prospective jurors, media outlets, and families of the victims in one courtroom, and that the proceedings would not be “closed” to the media because of the audio-feed option. Counsel for Mr. Dunn did not take a position on this issue, but the State consented to the court’s oral ruling.
Petitioners filed the affidavits of two reporters in support of their petition before this court. The reporters attest that they were excluded from the courtroom during jury selection on February 3, 2014, for the stated reason that there was insufficient room in the courtroom for any members of the press. However, both affiants are of the opinion that there was ample room for the media to be physically present in the courtroom. The media representatives were directed to an “overflow courtroom” where an audio feed of the proceedings was provided. Because the trial judge was the only person sitting in front of a microphone, the media were unable to hear any of the attorneys’ questions to the prospective jurors, or the prospective jurors’ responses to those questions.
The affidavit filed by Larry Hannan, a reporter for The Florida Times-Union, asserts that at one point during the February 3 proceedings, the audio feed was turned off while the prospective jurors went to lunch; however, by the time the audio feed was turned back on, approximately 24 prospective jurors had been dismissed. It is therefore clear, asserts Mr. Hannan, that the trial judge and the attorneys held a portion of the February 3 proceedings while the media were barred from the courtroom and the audio feed was turned off.
Affiant Anne Schindler, a reporter for First Coast News, was a member of the media committee referenced in the trial court’s ruling. According to her affidavit, “[t]he idea that the media would be excluded from jury selection was never presented to the Media Committee as a matter to be discussed.” Further, “[t]he Media Committee never agreed that members of the media would be excluded from the courtroom. To the contrary, the Media Committee took every step possible to ensure that this trial was open to the public.”
On the second day of jury selection, Petitioners were given an opportunity to be heard regarding the problems experienced with the audio feed the day before. Petitioners reiterated their position that the media are entitled to be physically present during jury selection. Ultimately, the trial court agreed to allow two reporters to be physically present for the remainder of jury selection that day, and allowed four reporters to be present the following day. Court personnel corrected the audio problems in the overflow room and installed a video monitor.
However, during a recess in the proceedings the next day, at which time the courtroom was closed to the public, the court conducted the challenge portion of jury selection without the venire present. *775 Following some discussion regarding the striking of jurors, the State asked the judge whether the audio/video feed was off. Court personnel stated, “Audio video is off right now. I am not turning anything on until I get direction from you.” The discussion continued as follows:
[STATE ATTORNEY]: I would submit respectfully that this is a chambers-type proceeding that could easily be held in chambers but that sometimes for convenience sake a Court can close off the courtroom as chambers and that’s what I believe. I mean we could all go into the jury room.
THE COURT: You are right. We could so my thought was we will leave everything off. We have a court reporter taking down everything that’s being said and it’s just us basically in chambers.
[STATE ATTORNEY]: Thank you, Your Honor, because we do have a lot of legal argument or possibly [sic].
Counsel for Mr. Dunn made no objection. Jury selection ensued and was completed following this exchange, with the media absent from the courtroom and the audio and video feed turned off entirely.
Several days later, on February 8, the trial court entered a written order holding that Petitioners had no right to be physically present at the jury selection proceedings and that the audio feed was sufficient to preserve the press’s right of access to the criminal trial.[2] The trial court found that the defendant’s right to a fair trial is paramount, and in any event, the restriction of the media’s access to an audio feed does not constitute closure. The order noted that the victims’ families had agreed to listen in via audio feed rather than be physically present. To allow the media to be physically present, but not the families of the victims, would be unfair because the victims’ families have a constitutional right to be present as well. The court found that Petitioners, as members of the court-appointed “media committee,” had agreed to the audio feed alternative months prior to trial, but waited until the morning of jury selection to object. Furthermore, the order asserted that although the courtroom capacity is 227, the gallery holds only 100 people comfortably.
Petitioners filed an emergency petition with this court to review the orders of the trial court excluding the media from the courtroom proceedings.
II.
Petitioners submit that the actions of the trial court outlined above amount to a violation of their First Amendment right of access to criminal trial proceedings. The State[3] counters with four main premises: (1) this court lacks jurisdiction to entertain the petition because Petitioners have failed to show the existence of any written or oral order; (2) the petition is moot because the trial court addressed Petitioners’ complaints during the course of the proceedings; (8) Petitioners’ due process rights were not violated because they received notice below and an opportunity to be heard; and (4) no actual closure of the proceedings occurred; rather, the trial court placed permissible restrictions to public access and properly conducted “bench conferences” outside the hearing of the media and the public.[4] We consider each of these points in turn.
*776 A.
An order excluding the press or public from a judicial proceeding is reviewable pursuant to Rule 9.100(d) of the Florida Rules of Appellate Procedure. While Petitioners have identified multiple instances in which their access to the judicial proceedings below was allegedly restricted, only two of these instances resulted in reviewable orders that merit a full discussion. The first such order is the trial court’s oral ruling on February 3, which was later memorialized in a written ruling dated February 8, denying the media’s request to be physically present for jury selection. The second order is the trial court’s oral ruling on February 5 to keep the audio feed off during the juror challenge portion of jury selection while the courtroom was closed.
B.
Despite the existence of reviewable orders, the State contends that Petitioners’ claims are moot because the trial court took remedial measures to correct the access issues. As the State properly acknowledges, however, there is a narrow, but well-established, exception to the mootness doctrine for controversies that are “capable of repetition, yet evading review.” Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 563, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (citing Southern Pacific Terminal Co. v. Interstate Commerce Comm’n, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). That exception applies when “(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.” Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Both elements are satisfied in this case. The closure orders at issue were in effect for a short period of time and evaded review until now, a result which is not uncommon and not surprising for this type of First Amendment challenge. See, e.g., Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (“[B]ecause criminal trials are typically of short duration, [a closure order] will likely evade review, or at least considered plenary review in this Court.” (internal citations omitted)). We further conclude that the underlying disputes concerning the deprivation of the public right to access criminal trial proceedings present important questions ca *777 pable of repetition. Although Mr. Dunn’s first trial has concluded, he received a mistrial on the most significant charge— premeditated murder — and is currently awaiting a retrial on that count. We have no doubt that the media will seek access to Mr. Dunn’s second trial and to other high-profile criminal trials in the future. Accordingly, we have jurisdiction.
III.
The United States Supreme Court’s landmark decision in Richmond, Newspapers recognized that the First Amendment guarantees both the public and the press a right to attend criminal trial proceedings.[5] Richmond Newspapers, 448 U.S. at 580, 100 S.Ct. 2814. At issue in that case was a Virginia trial court order excluding the public (and by extension, the press) from access to a murder trial upon the unopposed motion of the defendant. Recognizing it as a case of first impression, the Court engaged in an exhaustive historical analysis of the presumptively open nature of criminal trials in American jurisprudence, ultimately finding that “the historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo-American trial.” Id. at 569, 100 S.Ct. 2814. The Court concluded that “[f]rom this unbroken, uncontradicted history, supported by reasons as valid today as in centuries past ... a presumption of openness inheres in the very nature of a criminal trial under our system of justice.” Id. at 573, 100 S.Ct. 2814.
In addition to its historical overview, the Court also focused heavily on the public policy justifications for open criminal trials:
[Especially in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results.
When a shocking crime occurs, a community reaction of outrage and public protest often follows.... Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion....
Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people’s consciousness the fundamental, natural yearning to see justice done — or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if jüstice is “done in a corner [or] in any covert manner.”
Id. at 571, 100 S.Ct. 2814 (citations omitted). Especially in the present era of ubiquitous electronic media, “[i]nstead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates *778 the media claim of functioning as surrogates for the public.” Id. at 572-73, 100 5.Ct. 2814.
Having established the guaranteed right of the public and the press to attend criminal trials, the Court in Richmond Newspapers addressed the closure order before it and held that “[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.” Id. at 581, 100 S.Ct. 2814. Because the trial court had not made any findings supporting closure and did not consider any options short of closure that would “satisfy the constitutional demands of fairness,” the public’s exclusion from the trial was improper. Id.
Richmond Newspapers paved the way for the Court’s later expansion of the First Amendment presumption of openness to include voir dire in criminal trials. Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (“Press-Enterprise I ”). There, a California trial court had excluded the press from the individual voir dire examination of prospective jurors in a capital murder prosecution, and also denied the press access to the transcript of the proceedings. Id. 504, 104 S.Ct. 819. As it had done previously, the Court incorporated history and policy in its analysis to support a presumption of openness. The Court recounted the historical roots of public jury selection to England and colonial America, noting that “since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown.” Id. at 505, 104 S.Ct. 819. The Court reasoned that the value of public access is equally important today because it “enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.” Id. at 508, 104 S.Ct. 819. It also provides a “community therapeutic value” in “knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected.” Id. at 508-09, 104 S.Ct. 819.
Emphasizing that closed proceedings should be “rare,” the Court acknowledged that the constitutional right to public access is not absolute. Press-Enterprise I, 464 U.S. at 509, 104 S.Ct. 819. When competing rights and interests are at play, the Court instructed that:
[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
Id. at 510, 104 S.Ct. 819 (emphasis added). The Court concluded that the reasons asserted for the California closure order— the right of the defendant to a fair trial and juror privacy — were unsupported by findings that an open proceeding would threaten those interests. The Court further stated that even with adequate findings, the trial court could not properly close voir dire without considering whether alternatives to closure were available.[6] Id. at 511, 104 S.Ct. 819.
The Court has since reaffirmed the constitutional right to a public trial, and more particularly, to the jury selection phase of a criminal trial, in the context of a defendant’s Sixth Amendment right. Presley v. *779 Georgia, 558 U.S. 209, 180 S.Ct. 721, 175 L.Ed.2d 675 (2010). In Presley, the Court summarily held that the defendant’s Sixth Amendment right to a public trial was violated when the trial judge excluded the “lone courtroom observer” from voir dire, over defendant’s objection, purportedly due to space limitations in the courtroom. The Court reiterated the standards, originally announced in Press-Enterprise I, which courts must apply before closing any portion of a criminal trial.[7] Id. at 214, 130 S.Ct. 721. In the order under review, the Court determined that the trial judge failed to consider alternatives to closure, even though none had been offered by the parties. Because that error, standing alone, was sufficient to warrant relief, the Court declined to address whether the trial court had established an overriding interest in closing voir dire. In so holding, the Court emphasized that “[tjrial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials.” Id. at 215, 130 S.Ct. 721.
Before turning to our analysis, a decision of the Florida Supreme Court is also relevant to review. In Miami Herald Publishing Company v. Lewis, the Court recognized a common-law presumption of public access to pretrial hearings in criminal cases. 426 So.2d 1 (Fla.1982). Initially, the Court rejected the argument of the media that the First Amendment guarantees the right of public access to pretrial proceedings, “as distinguished from the right to attend a criminal trial.” Id. at 6. But given the Court’s support for open government and its recognition that “[w]hat transpires in the courtroom is public property,” the Court instructed trial courts to operate under the assumption that the public and the press should ordinarily have unrestricted access to judicial proceedings. Id. at 7; see generally State ex. rel. Miami Herald Publ’g Co. v. McIntosh, 340 So.2d 904 (Fla.1977). Recognizing that an inherent conflict may arise between the fundamental rights of an accused to a fair trial, and of public access to the judicial process, the Court delineated a three-part test for assessing whether closure of a judicial proceeding is appropriate. Lewis, 426 So.2d at 6-7. Under the “Lewis test,” those seeking closure have the burden to establish that:
1. Closure is necessary to prevent a serious and imminent threat to the administration of justice; 2. No alternatives are available, other than change of venue, which would protect a defendant’s right to a fair trial; and 3. Closure would be effective in protecting the rights of the accused, without being broader than necessary to accomplish this purpose.
Id. at 6. If the trial court concludes that there is a “strict and inescapable necessity for closure,” it must make findings of fact based on record evidence and conclusions of law for the benefit of the reviewing court. Id. at 8-9.
With the foregoing law as our framework, we address the orders under review.
A.
The trial court’s February 8 written order, which memorialized its oral ruling on *780 February 3, excluded the media from physical access to the courtroom during the voir dire examination of prospective jurors. While the media were given access to an overflow room with an audio feed to the courtroom, the media’s ability to hear the proceeding was severely compromised that day. At some point during the second day of jury selection, the trial court reconsidered its earlier ruling and allowed a limited number of media to attend the proceedings in person. In sum, the trial court’s order restricted the media’s access to Mr. Dunn’s criminal trial for the first of three days of jury selection, and for a portion of the proceedings the second day.
Our first decision point is to determine whether the qualified right of public access to criminal trials, guaranteed by the First and Fourteenth Amendments, attaches to the jury selection proceedings at issue. We conclude that Press-Enterprise I is directly controlling and answers that question affirmatively. See Press-Enterprise I, 464 U.S. at 505, 104 S.Ct. 819 (holding that the First Amendment right to a public trial in criminal cases includes the voir dire process).
We must next decide whether there was closure of constitutional magnitude so as to require the Press-Enterprise I balancing test. The trial court states in its order that there has been “no closure nor any prohibition of media access during jury selection; rather the audio feed serves as the media and public’s access to the proceedings.” We disagree. By limiting their observation of the proceedings to audio, Petitioners were deprived of the ability to see the judge, prospective jurors, and attorneys to evaluate their demeanor, body language, and other non-verbal expressions. In analogous situations, courts have held that the availability of a transcript of a proceeding is not a sufficient substitute for a public presence at the proceeding. See, e.g., ABC, Inc. v. Stewart, 360 F.3d 90, 99 (2d Cir.2004) (“[0]ne cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access — not, as the government describes, an incremental benefit.”); Soc’y of Prof'l Journalists v. Sec’y of Labor, 616 F.Supp. 569, 578 (D.Utah 1985) (“[T]he full flavor of [a] hearing cannot be sensed from the sterile sheets of a transcript. Emotions, gestures, facial expressions, and pregnant pauses do not appear on the reported transcript. Much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds.” (citation omitted)). Even if the audio feed was working properly in the overflow room, the trial court’s decision to exclude the public from physical access to the courtroom during jury selection was a sufficient constitutional infringement to trigger application of the Press-Enterprise I test.
Under Press-Enterprise I, the trial court did not engage in the appropriate analysis before barring the media and the public from physical access to the courtroom. Reading the order liberally, it appears that the “overriding interest” advanced by the order is safeguarding the defendant’s Sixth Amendment right to a fair trial. We recognize that the United States Supreme Court has noted that “[n]o right ranks higher than the right of the accused to a fair trial” and in certain limited circumstances, the right of public access must yield accordingly. Press-Enterprise I, 464 U.S. at 508, 104 S.Ct. 819. The trial court bears the heavy burden of preserving order and decorum in the courtroom and safeguarding the defendant’s right to a fair trial; this is a task often made exponentially more difficult in a high-profile case.
*781 But notwithstanding the paramount importance of the accused’s right to a fair trial, the trial court was nevertheless required to articulate specific findings supported by the record that closure was essential to preserving the defendant’s right, and that there were no reasonable alternatives to protect that interest.[8] Press-Enterprise I, 464 U.S. at 513, 104 S.Ct. 819; Press-Enterprise II, 478 U.S. at 15, 106 S.Ct. 2735 (“The First Amendment right of access cannot be overcome by the conclu-sory assertion that publicity might deprive the defendant [of the right to an impartial verdict].”). The reasons given for closure in this case included the suggestion that the courtroom was too small to accommodate all of the prospective jurors, the media outlets, and the families of the victims; that “arrangements were made with the Media Committee months in advance of the trial to hear real-time audio of the jury selection process” and Petitioners waited until the last minute to lodge an objection; and that it would be unfair to allow the media access to the courtroom when the families of the victims had agreed not to be present. These findings are unsupported by record evidence and the order fails to show how these factors would constitute an infringement on the defendant’s Sixth Amendment right to a fair trial.
With respect to the potential waiver issue, there is no support in the record before us that Petitioners consented to being physically excluded from the courtroom or had ample notice regarding the closure prior to the start of trial. To the contrary, the affidavit from reporter Anne Schindler directly refutes these findings.[9] Moreover, Petitioners argued this point to the trial court prior to the exclusion order *782 being entered. To the extent that an issue of fact was created, the trial court should have held an evidentiary hearing to resolve the conflict. There exists a presumption in favor of openness, and the burden is on the party seeking closure to justify that result.
On the issue of courtroom capacity, the trial court did not articulate how an open proceeding would threaten the defendant’s right to a fair trial. Affidavits in the record indicate that there was adequate seating available for media representatives during jury selection. But perhaps most significantly, the trial court did not consider any alternative solutions to account for the public’s right to be physically present for jury selection.[10] That error alone warrants vacating the closure order. Presley, 558 U.S. at 216, 130 S.Ct. 721. All courtrooms have limited capacity, and precedent permits courts to place reasonable restrictions on general access. In this case, the media suggested allocating a limited number of seats for media representatives, who would pool their resources and alternate attendance. Presley offers other possible solutions including “reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.” Id. at 215, 130 S.Ct. 721. The orders barring the media from physically attending jury selection fail to overcome the presumption of openness, and this failure constitutes reversible error.
B.
The February 5, 2014, oral order of the trial court similarly fails to comply with the constitutionally mandated balancing tests described above. The audio feed was left off while the courtroom was empty of press, public, and prospective jurors, and the striking of jurors was conducted until the process of jury selection was completed. Far from conducting a hearing on this closure, making findings of fact to support the closure, or considering alternatives to closure, the trial court simply declared the juror challenge proceeding to be an “in chambers” hearing, with no notice to the media or opportunity for the media to object.
The State does not argue before this court, as did the State Attorney below, that the proceeding constituted an “in chambers” hearing; instead, the State argues that the proceeding was effectively a “bench conference”[11] to which the media have no right of access. We fully agree with the premise that the public (and by extension, the press) generally have no right of access to sidebars or bench conferences,[12] or to certain conferences conduct *783 ed in judicial chambers. As explained by Justice Brennan in his concurrence to the plurality opinion in Richmond Newspapers:
The presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interests of decorum. Thus, when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle. Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings.
Richmond Newspapers, 448 U.S. at 598 n. 23, 100 S.Ct. 2814 (emphasis added) (internal citation omitted). Indeed, our resolution of the media access issues in this case does not foreclose the practice of using sidebar conferences in open court, out of the earshot of the jury, to address either administrative issues or sensitive matters that traditionally have been kept from jurors in the interests of judicial administration. See, e.g., 6 Wayne R. LaFave, et. al., Crim. Proc. § 23.1(d), “Closed proceedings: First Amendment right of access” (3d ed. Dec. 2013) (noting that “lower courts consistently have held that they do not violate any right of First Amendment access when presentations [are] made in chambers or in sidebar conferences for appropriate administrative purposes (e.g., to ensure that the jury does not overhear the discussion), even though the press and public is thereby excluded”). We have not been presented with questions about the constitutional limitations of sidebars in an otherwise open courtroom with the media present; nor are we presented with the commonplace practice of allowing juror challenges at sidebar, when convenient to the court and agreed upon by the parties when no media observers are present. Instead, we address only the decision to conduct the juror striking portion of jury selection behind closed doors over the objections of the media.
We need not parse the terms used to describe the proceeding for the purpose of our analysis, for “the First Amendment question cannot be resolved solely on the label we give the event ....” Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. 2735. “[A] proceeding that would be subject to a right of access if held in open court does not lose that character simply because the trial court chooses to hold the proceeding in chambers.” NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, 20 Cal.4th 1178, 86 Cal.Rptr.2d 778, 980 P.2d 337, 363 (1999). A functional analysis is necessary to determine whether the closed proceeding is part of the trial process to which the First Amendment right of access attaches. See, e.g., Palm Beach Newspapers, Inc. v. Harper, 417 So.2d 1100 (Fla. 4th DCA 1982) (holding that chambers conference, the purpose of which was to inform counsel that judge’s secretary had received an anonymous telephone call relating to one of the parties, was not a judicial proceeding at which the press and public were entitled to be present).
Here, the purported “bench conference” was, in fact, a substantive part of the trial.[13] In the context of a defendant’s *784 right to be present for trial, Florida courts have consistently held that the “challenge of jurors is one of the essential stages of a criminal trial where the defendant’s presence is required.” Salcedo v. State, 497 So.2d 1294, 1295 (Fla. 1st DCA 1986) (citing Lane v. State, 459 So.2d 1145, 1146 (Fla. 3d DCA 1984)); see also Luyao v. State, 982 So.2d 1234, 1235 (Fla. 4th DCA 2008) (noting that the “ ‘examination and challenge of potential jurors is one of the essential stages of a criminal trial where a defendant’s presence is mandated’ ”) (emphasis added) (quoting Matthews v. State, 687 So.2d 908, 909 (Fla. 4th DCA 1997)). The juror challenge phase “is not a mere ‘mechanical function’ but may involve the formulation of on-the-spot strategy decisions which may be influenced by the acts of the state at that time.” Salcedo, 497 So.2d at 1295.
In California v. Harris, a California state appeals court found that in holding the peremptory challenge portion of voir dire in chambers, the trial court violated the defendant’s Sixth Amendment right to a public trial. See California v. Harris, 10 Cal.App.4th 672, 12 Cal.Rptr.2d 758 (1992). While relief was granted in the direct appeal predicated upon a Sixth Amendment analysis, that case is nevertheless instructive in this First Amendment case. Quoting Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), for the proposition that “the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public,” the Harris court utilized the balancing test articulated in Press-Enterprise I to conclude that “[t]he peremptory challenge process, precisely because it is an integral part of the voir dire/jury impanelment process, is part of the ‘trial’ to which a criminal defendant’s constitutional right to a public trial extends. Thus, in this case, the trial court’s ‘chamber striking’ method of conducting a portion of the peremptory challenge process was at least a prima facie violation of [the] defendant’s constitutional right to a public trial.” Harris, 12 Cal.Rptr.2d at 764. We agree with the Harris court’s conclusion in this First Amendment context.
Furthermore, even if First Amendment rights were not implicated by this closure, the trial court was constrained by the common-law right of access to criminal proceedings recognized by the Florida Supreme Court in Lewis, supra. Although Lewis dealt specifically with access to a pretrial suppression hearing, its reasoning equally applies to the juror challenge phase of jury selection. In an illustrative juxtaposition, the Court in Palm Beach Newspapers, Inc. v. Burk rejected press access to unfiled depositions in a criminal proceeding by reiterating its rationale for finding a presumption of access in Lewis:
Our commitment to opening the judicial process to [pretrial suppression] hearings was predicated on the fact that suppression hearings were judicial proceedings and we, therefore, provided a method for press participation because the public has “a right to know what occurs in the courts.” Discovery depositions are judicially compelled for the *785 purpose of allowing parties to investigate and prepare their case, but, unlike a suppression hearing, they are not judicial proceedings “for the simple reason that there is no judge present, and no rulings nor adjudications of any sort are made by any judicial authority.”
Palm Beach Newspapers, Inc. v. Burk, 504 So.2d 378, 384 (Fla.1987) (emphasis in original) (internal citation omitted). As the juror challenge phase of jury selection is a “judicial proceeding” and an essential part of a criminal trial, we conclude that Lewis provides an additional mandate for a qualified right to public access, requiring both procedural and substantive safeguards prior to closure.
IV.
The “right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and ‘of the press could be eviscerated.’ ” Richmond Newspapers, 448 U.S. at 580, 100 S.Ct. 2814 (footnote and citations omitted). “The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily.” Id. at 576-77, 448 U.S. 555. Upon consideration of this precept, and based upon the analysis above, we GRANT the media’s petition for review of orders excluding the press or public and VACATE the orders identified in this opinion.
THOMAS and MAKAR, JJ., concur.

. The "media committee" referenced throughout this proceeding refers to a committee established pursuant to Fourth Judicial Circuit Administrative Order No.2013-08 relating to "Media and Technological Coverage of Cases of Extraordinary Public Interest.” The media committee consists of representatives from the media and the circuit court to "attend to issues surrounding the regulation of media representatives and to ensure all media representative's [sic] compliance with all Court orders.”

.Petitioners assert that they did not receive a copy of this order until it was served via email on February 12, 2014.

. There has been no response to the petition from the State's co-respondent, Mr. Dunn.

. The State raises other collateral arguments that we mention here for the sake of compre *776 hensiveness, but which do not warrant more exhaustive discussion or analysis. First, the State argues that Petitioners have failed to provide us with an adequate record for review. We find this argument to be without merit as Petitioners have provided this court with, inter alia, the trial court's written ruling and transcripts of discussions held on the relevant closure issues. Second, the State asserts that Petitioners are “third parties” which are improperly interfering with the judicial process in the criminal proceeding and are without authority to seek to overturn a criminal conviction. While we agree that Petitioners are not per se parties to the criminal proceeding, the media were granted interve-nor status below for the purpose of determining the parameters of their First Amendment right of access to the trial proceedings, and they have clear standing before this court to seek review of orders excluding them from the proceedings. Fla. R. App. P. 9.100(d). Moreover, the media are seeking to vindicate their First Amendment right to access, not Mr. Dunn’s Sixth Amendment right to a public trial. Third, the State contends that the media were afforded procedural due process relative to the access issues in the form of notice of the restrictions and an opportunity to be heard on the restrictions. Petitioners' procedural due process rights are incorporated in our discussion infra on the procedural requirements that courts must satisfy before restricting public access to criminal trial proceedings.

. The First Amendment, as applied to the States by the Fourteenth Amendment, provides that:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
While the public’s right of access to criminal trials is not explicit in the text of the First Amendment, the plurality opinion in Richmond Newspapers concluded that this unartic-ulated right is implicit in the enumerated guarantees of the First Amendment.

. In a successor case to Press-Enterprise I, the United States Supreme Court expanded the scope of the First Amendment right of public access even further, this time to a proceeding beyond the criminal "trial” itself — the preliminary hearing. Press-Enterprise Co. v. Superi- or Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) {Press-Enterprise II).

. The Press-Enterprise I standards were later adopted by the United States Supreme Court in Waller v. Georgia, which extended the Sixth Amendment right to a public trial to include pretrial suppression hearings. 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). This four-part test, often referred to as the "Waller test,” provides that: "[(1)] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [ (2) ] the closure must be no broader than necessary to protect that interest, [ (3) ] the trial court must consider reasonable alternatives to closing the proceeding, and [ (4) ] it must make findings adequate to support the closure.” Id. at 48, 104 S.Ct. 2210.

. The accused’s right to a fair trial and the public right of access are "not necessarily inconsistent” interests. Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. 2735. "Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers.” Id.

. In its response to the petition, the State expressly declined to take a position regarding the propriety of the trial court’s decision barring the media’s physical presence in the courtroom during jury selection, although it conceded at oral argument that this ruling would have been improper had the media not waived their right to be physically present by agreeing to attend jury selection via audio feed. After oral argument, the State filed an affidavit dated March 12, 2014, of the trial court administrator, who represented that a "decision was made” that the victims’ families, additional state attorney staff, and the media “would not be present” in the courtroom "during jury selection” and that audio and video were to be made available in a nearby courtroom. The trial court administrator further stated that he contacted the chair of the media committee and reporter Larry Hannan on March 12, 2014, and that both acknowledged that the media committee chair had passed along information that an audio feed was to be available for voir dire. The State, however, had concurrently received an email from the media committee chair, who said that the media committee had not agreed to any protocols related to jury selection, a topic that first came to his attention sometime during the middle to latter part of the week immediately prior to voir dire beginning. He disavowed that the media had agreed to the audio feed alternative, specifically noting that "[sjome members of the media had objected” to exclusion from the live proceedings. Based on these filings and the record before us generally, it is evident that no judicial hearing was held by the trial court on the media’s exclusion from voir dire, only that a "decision was made” by someone at some point to do so. The trial judge, apparently operating under misinformation regarding what had occurred, concluded that the media had been privy to and agreed with the “decision” to exclude them, resulting in the impression that the media had "sandbagged” the matter by waiting to object until the start of voir dire. This then formed the basis for the State's argument that the media waived their right to be physically present for jury selection.

.This does not suggest that trial courts have a duty to find a seat for every person who wishes to attend judicial proceedings; however, it cannot categorically exclude the public or the press unless the presumption of openness is successfully rebutted. "Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission.” Estes v. Texas, 381 U.S. 532, 588-89, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, X, concurring).

. A bench conference, or "sidebar conference,” refers to a discussion at the bench "among the judge and counsel, usu. over an evidentiary objection, outside the jury's hearing.” Black’s Law Dictionary (9th ed. 2009). In the proceedings at issue, the venire was not present in the courtroom.

. The Florida Rules of Judicial Administration governing "Technological Coverage of Judicial Proceedings” prohibit "audio pickup or broadcast” of bench conferences in order to protect "the attorney-client privilege and the effective right to counsel.” Fla. R. Jud. Admin. 2.450(g).

. In the State of Florida, the process of juror challenges is regulated by the Florida Rules of Criminal Procedure. Significantly, the relevant rules may be found under the subsection titled "IX. THE TRIAL,” which includes rules governing voir dire (Rule 3.300), juror oaths (Rule 3.360), and numerous rules relating to juror striking, including Rule 3.310 ("Time for Challenge”), Rule 3.315 ("Exercise of Challenges”), Rule 3.320 ("Manner of Challenge”), Rule 3.330 ("Determination of Challenge for Cause”), Rule 3.340 ("Effect of *784 Sustaining Challenge”), and Rule 3.350 ("Peremptory Challenges”). “On the motion of any party, all challenges shall be addressed to the court outside the hearing of the jury panel in a manner selected by the court so that the jury panel is not aware of the nature of the challenge, the party making the challenge, or the basis of the court’s ruling on the challenge, if for cause.” Fla. R. Crim. P. 3.315. Rule 3.180 mandates a defendant’s presence "at the beginning of the trial during the examination, challenging, impanelling, and swearing of the jury.” Fla. R. Crim. P. 3.180(a)(4) (emphasis added).