An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

# IN THE SUPREME COURT OF THE STATE OF NEVADA

WILLIAM JOHN KECK,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 61675

**FILED**

APR 2 1 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY ___S. Young___
DEPUTY CLERK

## ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction in a death penalty case. Eighth Judicial District Court, Clark County; Douglas W. Herndon, Judge.

In the early morning hours of November 3, 2008, Matthew Staley was on duty as an unarmed security guard at the Villa Cordova Apartments in Las Vegas. While on patrol, Staley heard something akin to a power drill or "like a wall or something was being drilled into." Following the noise, he happened upon a cloud of smoke or sawdust through which he saw William Keck dressed in black cargo pants, a black long-sleeved shirt or jacket, a black ball cap, and "tactical" boots standing in front of apartment 305 or 305-A. Keck made eye contact with Staley, and, within seconds, Keck swung his arm around revealing a large assault rifle, which he pointed at Staley's head. Keck told Staley, "I wouldn't do it." Staley fled. As he was running away, Staley heard 12 to 14 gunshots. After taking refuge under a stairwell, he called 911. Keck's estranged wife, Angelique Reyes, lived in apartment 305 with her boyfriend, Jonathan Lestelle. Reyes was 17 weeks pregnant at the time. About 12:30 that morning, the couple's dog began to growl, prompting the couple

to get out of bed and investigate. Within moments of getting up, they heard "what sounded like power tools." Lestelle ran out of the bedroom with Reyes following. Seconds later, Lestelle ran back toward the bedroom, telling Reyes to call 911 while he searched his backpack for his gun. As she was dialing 911, they saw a chainsaw coming through the apartment door. The chainsaw stopped. Suddenly, Lestelle turned around, told Reyes, "They are here." Bullets pierced through the front door, and Lestelle pushed Reyes back in to the bedroom. As she fell backward in to the bedroom, she felt "pressure all over [her] body" and watched Lestelle fall to the left of her. She felt herself being shot numerous times. Nearly unconscious and in pain and bleeding, she heard the 911 dispatcher calling out over the phone and shortly thereafter police officers found her. Reyes suffered eight gunshot wounds. She survived, but her unborn child did not.[1] Lestelle was shot multiple times and died as the result of a gunshot wound to his chest.

When asked at the scene who could have committed the shooting, Reyes told police officers that it could have been related to Lestelle recently gaining custody of his young son or it could have been Keck. During transport to the hospital, she told a police officer that she thought Keck had shot her. Other testimonial and forensic evidence connected Keck to the shootings.

The jury convicted Keck of first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon,

---

[1]Several days later, when Reyes regained sufficient strength, labor was induced. A bullet fell out of Reyes during delivery of the baby.

manslaughter killing of an unborn quick child, attempted burglary while in possession of a deadly weapon, and assault with the use of a deadly weapon.[2]

The State sought the death penalty based on four aggravating circumstances: (1) Keck had been previously convicted of a felony involving the use or threat of violence to another person (attempted murder of Reyes with the use of a deadly weapon); (2) he had been previously convicted of a felony involving the use or threat of violence to another person (assault of Staley with the use of a deadly weapon); (3) he killed Lestelle during a burglary; and (4) he knowingly created a great risk of death to more than one person. The evidence supporting the aggravating circumstances related exclusively to the circumstances of the crime. As other evidence in aggravation, *see* NRS 175.552(3), the prosecution introduced evidence of Keck's moderate criminal and prison disciplinary history. Photographs were admitted showing him holding an AK-47 rifle and a tattoo on his shoulder depicting a baby's head with the words "kill babies" above it. The prosecution also presented victim-impact testimony from Lestelle's mother, father, and grandfather who described Lestelle's artistic talent and the devastating impact his death has had on the family.

---

[2]The judgment of conviction incorrectly reflects that Keck was convicted of burglary while in possession of a deadly weapon. We direct the district court to correct the judgment of conviction to reflect that he was convicted of attempted burglary while in possession of a deadly weapon.

In mitigation, Keck introduced testimony of family members and friends who described his upbringing, positive aspects of his personality, his artistic talent, and the depression he suffered after his father suffered a stroke and his relationship with Reyes ended. He also presented medical evidence and testimony indicating that his core mental disturbance was schizotypal personality disorder, which resulted in paranoia and odd and inappropriate behavior. His medical history reveals that he had experienced anxiety, depression, and substance abuse problems. Brain scans suggested that he may have suffered head trauma at some point in his life, which could have led to "odd, peculiar behavior" and "catastrophic failure in [his] impulse control and [his] judgment." Testimony also revealed that Keck experienced complications with medications he was taking for his mental health problems. Keck expressed remorse and shame for his actions.

The jury found all of the aggravating circumstances submitted. Keck proffered five mitigating circumstances for the jury's consideration: (1) he was under the influence of extreme mental or emotional distress when he killed Lestelle, (2) he had mental health issues, (3) he served in the United States Navy, (4) his father had suffered a stroke and subsequent illness, and (5) any other mitigating circumstance. At least one juror found that the murder was mitigated by Keck's mental health issues. After concluding that the mitigating

circumstances did not outweigh the aggravating circumstances, the jury imposed death.[3] This appeal followed.

*Batson challenge*

Keck argues that the district court erred by denying his objection to the prosecution's use of peremptory challenges against two black women in violation of the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986). Because he did not challenge the prosecution's exercise of peremptory strikes against those jurors until after the jury had been sworn and the remaining venire members were excused, his objection was untimely and therefore he waived review of this issue on appeal. *Chambers v. Johnson*, 197 F.3d 732, 735 (5th Cir. 1999) (holding that *Batson* objection must be raised before venire is dismissed); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994) (concluding that "a *Batson* objection must be made at the latest before the venire is dismissed and before the trial commences"); *Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir. 1991) (concluding that *Batson* challenge was untimely where objection to peremptory strikes was made after excluded jurors dismissed and jury had been sworn); *see also Rhyne v. State*, 118 Nev. 1, 11 n.26, 38 P.3d 163, 170 n.26 (2002) (concluding that defendant's failure to object to prosecution's peremptory strikes of women jurors

---

[3]The district court sentenced Keck to multiple definite concurrent and consecutive terms in prison ranging from 12 to 60 months to 96 to 240 months for the remaining offenses and sentence enhancements.

waived his challenge on appeal, citing *Dias, Chambers,* and *Parham*).[4] Therefore, we decline to consider his *Batson* challenge.

*Evidentiary challenges*

Keck challenges several pieces of evidence admitted during the penalty hearing. First, he argues that the admission of evidence and testimony related to his criminal history and detention records constituted inadmissible hearsay, its admission violated his Sixth Amendment right to confrontation, and the evidence was impalpable and highly suspect. With the exception of evidence related to his alleged assault of a man at Lake Mead, Keck did not object to the admission of the challenged evidence. We review his unpreserved claims of error for plain error affecting his substantial rights. *Valdez v. State,* 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008). To the extent his challenges include the Lake Mead incident, we review for harmless error. *See Knipes v. State,* 124 Nev. 927, 935, 192 P.3d 1178, 1183 (2008) (explaining standards of review for constitutional and nonconstitutional error). As we explained in *Summers v. State,* 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006), the Sixth Amendment right to confrontation does not apply to capital sentencing hearings, and Keck has not presented any persuasive reason to overrule *Summers. See Miller v. Burk,* 124 Nev. 579, 597, 188 P.3d 1112, 1124 (2008) ("[U]nder the doctrine

---

[4]We reject Keck's contention that the record precludes a conclusion that his *Batson* objection was untimely because several unrecorded bench conferences occurred immediately before the jury was sworn and the remaining veniremembers were excused. Nothing in the record suggests that he raised a *Batson* objection during any of those unrecorded bench conferences.

of stare decisis, we will not overturn [precedent] absent compelling reasons for so doing." (footnote omitted)). Further, we have observed that hearsay is generally admissible in a capital penalty hearing. *See* NRS 175.552(3); *Thomas v. State*, 114 Nev. 1127, 1147, 967 P.2d 1111, 1124 (1998). Finally, we conclude that Keck has not demonstrated that any of the challenged evidence was impalpable or highly suspect. *See Silks v. State*, 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976). Second, Keck argues that the prosecution failed to provide notice of certain evidence offered in aggravation as required by NRS 175.552 and SCR 250(4)(f)—specifically, evidence that he believed Lestelle's three-year-old son was in the apartment on the night of the shooting. In its notice of aggravation, the prosecution indicated that the great-risk-of-death aggravating circumstance would be supported in part by evidence adduced at trial that Lestelle's son resided in the apartment but was not home at the time of the shootings. The notice did not expressly allege that Keck was aware that the child lived in the apartment. We conclude that adequate notice was given. Evidence that he was aware that the boy lived in the apartment merely established the mens rea required to prove the aggravating circumstance.

*Prosecutorial misconduct*

Keck argues that the State committed misconduct during the penalty hearing by purposefully eliciting "holiday" testimony and appealing to the jury's passions throughout its rebuttal argument thereby violating his federal and state constitutional rights to "due process, equal protection, a fair trial, fundamental fairness, his right to be free from

prosecutorial misconduct, and his right to be free from cruel and unusual punishment."[5] He also argues that the prosecutor committed misconduct by arguing facts not in evidence. Improper argument is prejudicial when it so infects the proceedings with unfairness as to make the results of the proceeding a denial of due process. *Thomas v. State*, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004); *Blake v. State*, 121 Nev. 779, 796, 121 P.3d 567, 578 (2005). Alleged improper statements should be considered in context. *Browning v. State*, 124 Nev. 517, 533, 188 P.3d 60, 72 (2008). Because Keck failed to object to the challenged testimony and argument, his claim is reviewed for plain error. *See Valdez*, 124 Nev. at 1190, 196 P.3d at 477. While Keck has not demonstrated plain error affecting his substantial rights regarding any of his challenges, we are compelled to address two of the prosecutor's arguments that we deem inflammatory and therefore improper.

*Wedding argument*

Keck challenges a lengthy passage of the prosecutor's rebuttal argument as inflammatory and designed to impassion the jury. The essence of the prosecutor's argument is as follows. The defense counsel's reference to weddings in his closing penalty hearing argument prompted the prosecutor to think about "Angel and Jonathan and the wedding day they will never have" and the wedding Lestelle's young son, Trenton, may have in 15 years. The prosecutor commented on how Trenton might

---

[5]There is no express constitutional right to a trial free from prosecutorial misconduct, and Keck does not explain how his rights to be free from cruel and unusual punishment and equal protection are implicated by the prosecutor's alleged misconduct.

explain his father's absence "on the most important day of [his] life to a wedding guest." Trenton would explain that his father was murdered, and, assuming imposition of life imprisonment, the killer was still alive and could receive visitors in prison. The prosecutor argued that Trenton might explain that even though the killer unsuccessfully attempted to kill Reyes, the jury sentenced the killer to life in prison. The wedding guest might also ask Trenton about his siblings, to which Trenton might respond that Reyes was pregnant with his little brother, but the baby died and the jury let the killer live even though the killer knew Reyes was pregnant.

Although defense counsel referred to a hypothetical wedding during his closing argument, the context of counsel's comments entreated the jurors to imagine themselves at a wedding reception where a guest comments that he has jury duty and other guests describe to this person how awful jury duty is and suggest ways to avoid it. Counsel's hypothetical scenario then turned to the guest having served on a capital case where death was imposed and the guest being peppered with comments that the defendant's crimes must have been akin to those committed on September 11, 2001, or a mass shooting, or the kidnapping, sexual assault, and killing of a child. In contrast, the prosecutor's argument asked the jurors to imagine Trenton's future wedding day—an event that conjures up strong familial emotions—and how he might explain his father's absence and the absence of his deceased sibling (Reyes' unborn child). Simply because defense counsel employed a wedding scenario in his closing argument did not open the door to using that event for an improper purpose. Arguments touching upon the absence of a murdered loved one on holidays or important life events such as a wedding serve only to appeal to jurors' emotions rather than guiding jurors to

legitimate sentencing considerations. While the setting of a wedding was not of particular importance to defense counsel's argument, it was of crucial significance to the prosecutor's argument. We conclude that the prosecutor's "wedding" argument did not fall within the purview of appropriate rebuttal but was designed to inflame the passions and sympathy of the jury. However, misconduct was committed by defense counsel as well. Although defense counsel's use of a wedding venue is not overly troubling in this particular instance, the overall tenor of his argument suggested to the jurors that they might be in a position someday where they would have to explain their decision to the public and would likely be criticized or subjected to ridicule because they imposed death in a case that did not involve a terrorist attack, a mass shooting, or the sexual abuse and death of a child. We conclude that counsel's argument was inflammatory and therefore improper. While misconduct occurred, Keck's substantial rights were not affected considering the overwhelming evidence supporting the death sentence.

*Bullet argument*

Keck takes issue with the prosecutor's argument that Reyes was "forced to deliver the very bullet that killed her baby" on the grounds that no evidence established which bullet killed the fetus and the comment was designed to inflame the jury. The evidence shows that Reyes was shot eight times, including her abdomen, and the baby died as a result of "multiple maternal gunshot wounds." Several days after the shooting, when Reyes had regained sufficient strength, she delivered the baby. One bullet passed during delivery. While the evidence shows that a bullet fell out of her body during delivery of the fetus, the prosecutor's use of the word "delivered" left the jurors with a vividly disturbing image that

served no other purpose than to inflame the jury's passions and sympathy in an already emotionally charged case. This argument was improper. Nevertheless, the error did not affect Keck's substantial rights considering the nature and circumstances of Lestelle's murder and the compelling aggravating circumstances found.

*Public trial right*

Keck contends that the district court violated his Sixth Amendment right to a public trial by removing a spectator from the courtroom during the penalty hearing and refusing to record bench conferences. Because Keck expressly acquiesced in the district court's removal of the spectator, he cannot now complain that error occurred. *See Levine v. United States*, 362 U.S. 610, 617-20 (1960); *Commonwealth v. Ray*, 4 N.E.3d 221, 228 (Mass. 2014). As to the unrecorded bench conferences, we conclude that bench conferences do not implicate the constitutional right to a public trial. *See Richmond Newspaper, Inc. v. Virginia*, 448 U.S. 555, 598 n.23 (1980) (Brennen, J., concurring) (observing that "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle"); *Morris Publishing Group, LLC v. State*, 136 So. 3d 770, 782-83 (Fla. Dist. Ct. App. 2014) (observing that "the public (and by extension, the press) generally have no right of access to sidebars or bench conferences, or to certain conferences conducted in judicial chambers"). It therefore follows that the absence of a recording of bench conferences cannot violate the Sixth Amendment right to a public trial.

*Mitigation instruction*

Keck argues that the district court's jury instruction defining mitigating circumstances was erroneous because it unconstitutionally

narrowed the type of mitigation evidence that the jury could consider, leading the jury to believe that it could not consider aspects of his character or record as mitigating circumstances. Because he did not object to the instruction, we review for plain error affecting his substantial rights. *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). In *Watson v. State*, we considered an identical instruction to the one given here and concluded that there was no reasonable likelihood that the jury misunderstood the instruction to preclude it from considering any aspect of the defendant's character or record as a mitigating circumstance regardless of whether it reflected on his moral culpability. 130 Nev. ___, ___, 335 P.3d 157, 171-74 (2014). Here, Keck spent considerable time presenting mitigation evidence that was unrelated to the circumstances of the offense, including aspects of his childhood, his artistic talent, positive facets of his personality, and his mental health problems. The jury was given a verdict form listing four specific proposed mitigating circumstances plus "any other mitigating circumstance." Most of the mitigating circumstances were unrelated to the circumstances of the offense. Under the circumstances here, we are not convinced that the jury's rejection of some of the mitigating circumstances shows that the jury believed that it was precluded from considering his background, character, and other circumstances unrelated to the offense. We therefore conclude that there is no reasonable likelihood that the jurors misunderstood the instruction as precluding them from considering any aspect of Keck's character or record as a mitigating circumstance.

*Mandatory appellate review of the death sentence*

NRS 177.055(2) requires that this court review every death sentence and consider whether (1) sufficient evidence supports the

aggravating circumstances found, (2) the verdict was rendered under the influence of passion, prejudice or any other arbitrary factor, and (3) death sentence is excessive.

First, the jury found four aggravating circumstances—(1) Keck had a prior violent felony conviction based on his attempted murder of Reyes with the use of a deadly weapon, (2) he had a prior violent felony conviction based on his assault of Staley with the use of a deadly weapon, (3) he murdered Lestelle during the perpetration of an attempted burglary while in possession of a deadly weapon, and (4) he knowingly created a great risk of death to more than one person during the commission of the murder. The aggravating circumstances stem from the circumstances surrounding the murder and were proved beyond a reasonable doubt by evidence introduced during the guilt phase of trial.

Second, this was undoubtedly an emotional case that left the jurors with unforgettable images, including the shooting of a woman that resulted in the death of her unborn child. The prosecutor's impassioned account of Trenton's hypothetical wedding, highlighting the absence of Lestelle and Trenton's siblings at that event had the potential to inflame the jurors in an already emotionally-charged case. Nevertheless, we conclude that the prosecutor's misconduct did not improperly influence the jury where the record suggests a reflective jury. At least one juror found that the murder was mitigated by Keck's mental health issues, which played a significant role in his mitigation case. While the jury rejected the remaining three specific mitigating circumstances proffered, two of those mitigating circumstances—he committed the murder while under the influence of extreme mental or emotional distress and his father's stroke and subsequent illness—overlap with the mitigating circumstance found

because the evidence supporting those two mitigating circumstances concerned mental problems he experienced during childhood and at the time of the murder. The final mitigating circumstance based on his service in the Navy was undermined by evidence showing that he feigned mental illness to secure his separation from the service. Balancing the effect of the wedding argument against indications of a contemplative jury and the aggravating and mitigating evidence presented, we conclude that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Third, when considering whether the death sentence is excessive, we ask whether the "crime and the defendant before [the court] on appeal [are] of the class or kind that warrants the imposition of death?" *Dennis v. State*, 116 Nev. 1075, 1085, 13 P.3d 434, 440 (2000). The evidence shows that Keck, enraged by Reyes' pregnancy with another man's child, approached Reyes and Lestelle's apartment armed with a chainsaw and an assault rifle. He threatened an unarmed security guard at the apartment complex by pointing an assault rifle at the guard's head. Keck then chain sawed his way into Reyes and Lestelle's apartment and fired multiple rounds from his assault rifle. Lestelle died, and Reyes suffered eight gunshot wounds, resulting in significant injuries to her and the death of her unborn child. While Keck presented credible mitigation evidence, on balance with the calculated and vicious nature of the murder and circumstances of the crimes, the record supports a conclusion that the crime and Keck are of the class and kind that warrant the imposition of the death penalty. Accordingly, the death sentence is not excessive.

Having considered Keck's arguments and concluded that no relief is warranted, we

ORDER the judgment of conviction AFFIRMED.[6]

_____, C.J.
Hardesty

_____, J.          _____, J.
Parraguirre                          Douglas

_____, J.          _____, J.
Saitta                               Gibbons

_____, J.
Pickering

cc:    Hon. Douglas W. Herndon, District Judge
       Clark County Public Defender
       Attorney General/Carson City
       Clark County District Attorney
       Eighth District Court Clerk

---

[6]We reject Keck's claim that his death sentence is unconstitutional, as we have repeatedly upheld the constitutionality of the death penalty. *See, e.g., Nunnery v. State*, 127 Nev. ___, ___, 263 P.3d 235, 257 (2011); *Leonard v. State*, 117 Nev. 52, 83, 17 P.3d 397, 415-16 (2001); *Colwell v. State*, 112 Nev. 807, 814-15, 919 P.2d 403, 408 (1996). We also reject his claim that cumulative error warrants reversal of the judgment of conviction. *See generally Mulder v. State*, 116 Nev. 1, 17, 992 P.2d 845, 854-55 (2000) (explaining factors in cumulative-error analysis).

CHERRY, J., dissenting:

I dissent and would remand this matter to the district court for a new penalty hearing based on the cumulative effect of two errors. First, the prosecutor's rebuttal arguments about young Trenton's future wedding and Reyes' delivery of the bullet that killed her unborn child were overtly designed to inflame the jurors' emotions and distract them from basing their sentencing decision on the evidence and the law. I agree with the majority that defense counsel engaged in improper argument as well. But such obvious efforts by the prosecution to escalate the emotions of the jury are inexcusable, particularly in a case where, as here, the facts and circumstances of the offenses themselves undoubtedly elevated the jurors' sympathy and emotions. *See Tucker v. Zant*, 724 F.2d 882, 888 (11th Cir. 1984) (explaining that the "Constitution will not permit arguments on issues extrinsic to the crime or the criminal aimed at inflaming the jury's passions, playing on its fears, or otherwise goading it into an emotional state more receptive to a call for imposition of death and 'invit[ing] the jury to decide the life-death verdict in a frenzied and emotional atmosphere'" (quoting *Brooks v. Francis*, 716 F.2d 780, 789 (11th Cir. 1983))). Second, the jury received the same erroneous instruction at issue in our decision in *Watson v. State*, 130 Nev. ___, 335 P.3d 157 (2014). The concerns that I expressed about this instruction in my dissent in *Watson* are present here—the instruction likely confused the jury and improperly limited its consideration of mitigating evidence to those matters related to the offense. There is no room for confusion where jurors must determine whether a death sentence is appropriate. Justice requires that jurors receive clear instructions to guide their discretion in imposing punishment.

While I recognize that the facts and circumstances of the offenses in this case are disturbing and that Keck did not object to either error, the cumulative effect of the prosecutor's over-the-top emotionally charged arguments coupled with an erroneous mitigation instruction that likely confused the jury in exercising its sentencing discretion cannot be underestimated. As such, I conclude that this case demands a new penalty hearing.

_____, J.
Cherry

SUPREME COURT
OF
NEVADA

(O) 1947A